* Order for inclusion in MDL #381 filed in EDNY, 5/14/79.

# In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION.

## MDL No. 381.

### United States District Court, E. D. New York.

### Dec. 29, 1980.

Victor J. Yannacone, Jr., Yannacone & Yannacone, Patchogue, N. Y., Schlegel & Trafelet, Ltd., L. Steven Platt, Daniel C. Sullivan, Sullivan Associates, Ltd., Chicago, Ill., Hy Mayerson, Spring City, Pa., David Jaroslawicz, New York City, Newton B. Schwartz, P. C., Benton Musslewhite, Inc., Houston, Tex., Dorothy Thompson, Los Angeles, Cal., W. T. McMillan, W. T. McMillan & Co., associated counsel for Australian plaintiffs, Brisbane, Queensland, Australia, Jerry G. Wieslander, Frank G. Wieslander, Altoona, Iowa, Lewis A. Royal, Samuel Zelden, Des Moines, Iowa, David C. Anson, Deconcini, McDonald, Brammer, Yetwin & Lacy, Tucson, Ariz., Phillip E. Brown, Hoberg, Finger, Brown, Cox & Molliga, San Francisco, Cal., Melvin Block, Brooklyn, N. Y., Marshall A. Bernstein, Bernstein, Bernstein & Harrison, Philadelphia, Pa., Louis B. Merhige, New Orleans, La., Dennis M. O'Malley, Grant & Artesani, Boston, Mass., Leslie Hulnick, Wichita, Kan., Sidney W. Gilreath, Knoxville, Tenn., Stephen J. Cavanaugh, Bellaire, Tex., Robert P. Schuster, Spence, Moriarty & Schuster, Jackson, Wyo., Alton C. Todd, Brown & Todd, Alvin, Tex., Jules B. Olsman, Southfield, Mich., Gerald J. Adler, Crow, Lytle, Gilwee, Donoghue, Adler & Weninger, Sacramento, Cal., Jack E. London, Miami, Fla., David J. Ghilardi, Madison, Wis., William G. Morgan, Denver, Colo., Dante Mattioni, Philadelphia, Pa., Elgin L. Crull, Louisville, Ky., Charles

J. Traylor, Grand Junction, Colo., Victor L. Marcello, Talbot, Sotile, Carmouche, Waquespack & Marchand, Donaldsonville, La., Janet T. Phillips, Rodgers, Monsley, Woodbury & Berggreen, Las Vegas, Nev., William D. Nelsch, William A. Cohan, Denver, Colo., William J. Risner, Tucson, Ariz., James L. Witzel, McKelvey, Cottom & Witzel, East Lansing, Mich., Robert I. P. Pasternak, Jane R. Kaplan, Berkeley, Cal., Norton Frickey, Denver, Colo., Robert C. Huntley, Jr., Racine, Huntley & Olson, Pocatello, Idaho, Jacque B. Pucheu, Pucheu & Pucheu, Eunice, La., Jeffrey M. Stopford, Litvin, Blumberg, Matusow & Young, Philadelphia, Pa., Joseph D. Jamail, Jamail & Kolius, Houston, Tex., Leonard W. Schroeter, J. Kathleen Learned, Schroeter, Goldmark & Bender, P. S., Seattle, Wash., Bennett, DiFilippo, Davison, Henfling & Alessi, East Aurora, N. Y., James A. George, George & George, Baton Rouge, La., Robert M. Salzman, Pfeffer, Becker, Gabric & Cerveny, Chicago, Ill., Arden C. McClelland, McClelland Law Offices, Missoula, Mont., Daniel E. Becnel, Jr., Becnel & Faucheux, Reserve, La., Don S. Willner, Willner, Bennett, Bobbitt & Hartman, Portland, Or., Robert A. Taylor, Jr., Ashcraft & Gerel, Washington, D. C., John J. Lowrey, Chicago, Ill., Donald H. Dawson, Harvey, Kruse & Westen, P. C., Detroit, Mich., Jonathan N. Garver, Cleveland, Ohio, Dennis B. Francis, Gillenwater, Whelchel & Nichol, Knoxville, Tenn., Russell L. Cook, Jr., Fisher, Roch & Gallagher, Houston, Tex., Irwin E. Schermer, Schermer, Schwappach, Borkon & Ramstead, Minneapolis, Minn., David D. Noel, Jenkins & Jenkins, Knoxville, Tenn., Thomas E. Allen, Curtis, Crossen, Hensley, Allen, Curtis & Altman, St. Louis, Mo., Kenneth N. Molberg, Dallas, Tex., Phil M. Cartmell, Jr., Gage & Tucker, Kansas City, Mo., Wayne B. Harbarger, III, Littlefield, McDermand & Harbarger, Sacramento, Cal., William T. Jorden, Erie, Pa., Devine & Morris, Atlanta, Ga., Byron N. Fox and Gary K. Hoffman, Brown & Fox, Kansas City, Mo., Ernest L. Caulfield, New Orleans, La., Thomas E. Connolly, Schneider, Reilly, Zabin, Connolly & Costello, P. C., Boston, Mass., Gary W. Anderson, Erler, Taylor & Anderson, Louisville, Ky., John F. Vecchio, Houston, Tex., Caenen & Niederhauser, Mission, Kan., John T. Golden, Robert F. Stein and William J. Stradley, Stradley, Barnett & Stein, Houston, Tex., Douglass D. Hearne & Associates, Austin, Tex., Lawrence M. Ludwig and Kirby G. Upright, Scranton, Pa., Epstein & Kesselman, Chicago, Ill., Brenda S. Jenkins, Werner & Rusk, Houston, Tex., Richard R. Ravreby, Ravreby & Connolly, Carlsbad, Cal., Robert A. McNess, III, and Robert W. Knolton, Layton & McNess, P. C., Oak Ridge, Tenn., Henry E. Weil and Ronald S. Canter, Belli, Weil & Jacobs, Rockville, Md., Cletus E. Amlung and J. Michael Poole, Louisville, Ky., Synchef & Synchef, Chicago, Ill., Percy J. Blount, Saul, Blount & Martin, P. C., Augusta, Ga., Richard C. McLean, Denver, Colo., Carlton T. Wynn, Hare, Wynn, Newell & Newton, Birmingham, Ala., Owen J. Bradley, New Orleans, La., Elliot E. Brown, Metairie, La., James R. Dawson, Johnston, Thornton, Dawson & Hunter, Shreveport, La., Roger J. Larue, Jr., Metairie, La., William M. Beasley, Mitchell, Eskridge, Voge, Clayton & Beasley, Tupelo, Miss., Avram G. Adler, Adler, Barish, Levin & Creskoff, Philadelphia, Pa., Ned W. Johnson, Benckenstein, McNicholas, Oxford, Radford, Johnson & Nathan, Beaumont, Tex., Paul D. Rheingold, New York City, Fred D. Shapiro, Shapiro, Turoff & Gisser, Cleveland, Ohio, for plaintiffs.

Leonard L. Rivkin, Rivkin, Leff & Sherman, Garden City, N. Y., for Dow Chemical.

Morton B. Silberman, Clark, Gagliardi & Miller, White Plains, N. Y., Baker & McKenzie, Chicago, Ill., for Thompson-Hayward.

Wendell B. Alcorn, Jr., Cadwalader, Wickersham & Taft, New York City, for Diamond Shamrock.

Townley & Updike, New York City, for Monsanto.

Bud G. Holman and William Krohley, Kelley, Drye & Warren, New York City, for Hercules, Inc.

Joan Bernott, Dept. of Justice, Washington, D. C., for third-party defendant U. S.

Roy L. Reardon, James P. Barrett and Michael V. Corrigan, Simpson, Thacher & Bartlett, New York City, for Ansul Co.

Armand E. Capanna, Lewis, Overbeck & Furman, Chicago, Ill., for Riverdale Chemical Co.

Lawrence D. Lenihan, Thomas B. Kinzler and Alfred H. Hemingway, Jr., Arthur, Dry & Kalish, P. C., New York City, for Uniroyal.

Les J. Weinstein, McKenna & Fitting, New York City, for Occidental Petroleum Co.

William H. Sanders, William A. Lynch and Paul G. Lane, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for N. A. Phillips.

John M. Fitzpatrick, Dilworth, Paxson, Kalish, Lelvy & Kauffman, Philadelphia, Pa., for Hooker Chemical Co.

## TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 768 |
| I. SUMMARY OF CLAIMS | 769 |
| II. GOVERNMENT'S MOTION TO DISMISS THIRD PARTY COMPLAINTS | 769 |
| A. FTCA AS A GENERAL WAIVER OF SOVEREIGN IMMUNITY | 769 |
| B. THE *FERES* DOCTRINE | 770 |
| C. THIRD PARTY ACTIONS AGAINST THE GOVERNMENT | 772 |
| D. *FERES/STENCEL* IN THE CONTEXT OF THIS ACTION | 772 |
| E. SHOULD *FERES/STENCEL* APPLY TO THIS ACTION? | 773 |
| F. DID PLAINTIFFS' INJURIES ARISE OUT OF OR INCIDENT TO MILITARY SERVICE? | 774 |
| 1. General Principles | 775 |
| 2. Application of *Feres/Stencel* to Plaintiffs' Claims | 776 |
| (a) Plaintiff Veterans' Claims of Exposure | 776 |
| (b) Post-Discharge Failure to Warn | 777 |
| (c) The Australian Veterans' Claims | 779 |
| (d) Derivative Claims of Spouses, Parents and Children | 780 |
| (e) Claims of Direct Injury to Veterans' Children | 781 |
| G. DEFENDANTS' REMAINING CLAIMS AGAINST THE UNITED STATES | 781 |
| H. OTHER CLAIMS OF IMMUNITY | 782 |
| III. THE CASE MANAGEMENT PLAN | 782 |
| IV. CLASS ACTION | 787 |
| A. PREREQUISITES OF RULE 23(a) | 787 |
| 1. Numerosity | 787 |
| 2. Commonality | 787 |
| 3. Typicality | 787 |
| 4. Adequacy | 788 |
| 5. Additional Requirements | 788 |
| B. THE REQUIREMENTS OF RULE 23(b) | 788 |
| 1. Rule 23(b)(1) | 789 |
| 2. Rule 23(b)(2) | 790 |
| 3. Rule 23(b)(3) | 790 |
| C. NOTICE | 791 |
| V. SUMMARY JUDGMENT | 792 |
| A. THE GOVERNMENT CONTRACT DEFENSE | 792 |
| B. THE POSITIONS OF THE PARTIES | 794 |
| C. SUMMARY JUDGMENT DENIED | 795 |
| VI. DISCOVERY | 797 |
| VII. STATUTES OF LIMITATIONS | 797 |
| VIII. CONCLUSIONS | 798 |
| FOOTNOTES | 798 |

## INTRODUCTION

GEORGE C. PRATT, District Judge.

Plaintiffs, Vietnam war veterans and members of their families claiming to have suffered damage as a result of the veterans' exposure to herbicides in Vietnam[1], commenced these actions against the defendant chemical companies.[2] Defendants, seeking

1. Plaintiffs' complaints allege injury as a result of their exposure to a variety of herbicides including Agents Orange, Pink, Purple and Green. For convenience, the court will refer to these herbicides collectively as "Agent Orange".

2. At the present time 19 companies or divisions have been named as defendants in actions consolidated before this court as MDL 381. Alphabetically listed, the defendants named to date are: Agrisect, Inc.; Amchem Products, Inc.; Ansul Company; AKA Wormald America, Inc.; Diamond Alkali Company; Diamond Shamrock Corporation; Dow Chemical Company; GAF Corporation; Hercules, Inc.; Hoffman-Taff, Inc.; Hooker Chemical Company; Monsanto Company; North American Phillips Corporation; Northwest Industries, Inc.; Occidental Petroleum Company; Private Brands, Inc.; Riverdale Chemical; Syntex Corporation; Uniroyal, Inc. Although an individual action may name some of the chemical companies and not others, the court will refer to these companies collectively as "defendants".

Additionally, some of these named defendants have sought dismissal from some actions on the ground that they did not manufacure any of the herbicides in question. In some

indemnification or contribution in the event they are held liable to plaintiffs, then served third party complaints against the United States.[3] Five motions are now considered: (1) the government's motion to dismiss the third party complaint on grounds of sovereign immunity; (2) plaintiffs' motion for class action certification; (3) defendants' motion for summary judgment; (4) plaintiffs' motion to proceed with "serial trials"; and (5) plaintiffs' motion to serve and file a fifth amended verified complaint.

## I. SUMMARY OF CLAIMS

There are four groups of plaintiffs: Vietnam veterans, their spouses, their parents, and their children. They assert numerous theories of liability, including strict products liability, negligence, breach of warranty, intentional tort and nuisance. Plaintiff veterans seek to recover for personal injuries caused by their exposure to Agent Orange. The family members seek to recover on various derivative claims; some of the children assert claims in their own right for genetic injury and birth defects caused by their parents' exposure to the Agent Orange; and some of the veterans' wives seek to recover in their own right for miscarriages.

In their third party complaints against the government defendants allege negligence, misuse of product, post-discharge failure to warn, implied indemnity, denial of due process and failure to comply with herbicide registration laws.

## II. GOVERNMENT'S MOTION TO DISMISS THIRD PARTY COMPLAINTS

Moving to dismiss under F.R.C.P. 12(b)(6), the government claims "intra-military immunity" under the rule of *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), questions defendants' standing to assert some of their claims, urges that other claims may only be con-

sidered in the Court of Claims, and argues the applicability of three statutory exceptions to federal court jurisdiction under the Federal Tort Claims Act: (1) the discretionary function exception, 28 U.S.C. § 2680(a); (2) the combatant exception, 28 U.S.C. § 2680(j); and (3) the foreign country exception, 28 U.S.C. § 2680(k).

### A. FTCA AS A GENERAL WAIVER OF SOVEREIGN IMMUNITY

■ Under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) *et seq.*, the United States government waives its sovereign immunity from suits in tort, and vests jurisdiction over such claims exclusively in the United States District Courts. 28 U.S.C. § 1346(b). Its legislative history reveals two dominant congressional objectives. First, Congress sought to relieve itself of the overwhelming pressures and time consuming burdens of considering and passing upon the numerous private relief bills sought by claimants barred by the doctrine of sovereign immunity. *Feres v. United States*, 340 U.S. 135, 139–140, 71 S.Ct. 153, 156, 95 L.Ed. 152 (1950). Second, Congress sought to provide a judicial remedy for deserving claimants who had suffered injuries or losses at the hands of government officials and employees. 1 *Jayson, Handling Federal Tort Claims* § 65.01 at 3–3 (1980).

■ Although the FTCA "waives the Government's immunity from suit in sweeping language", *United States v. Yellow Cab Company*, 340 U.S. 543, 547, 71 S.Ct. 399, 402, 95 L.Ed. 523 (1951), the waiver is limited by the terms of the act's exceptions. If a claim falls within any exception to the FTCA, sovereign immunity has not been waived and the court is without jurisdiction to hear the case. *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976); *Dalehite v. United States*, 346 U.S. 15, 30–31, 73 S.Ct. 956, 965, 97 L.Ed. 1427 (1953).

---

cases, plaintiffs have consented to a conditional dismissal of those defendants.

**3.** As part of an on-going effort to avoid the service and filing of excessive quantities of

duplicative papers, the court has deemed the answers and third party complaints of the defendants to be served in all actions.

## B. THE *FERES* DOCTRINE

In *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), the Supreme Court determined that the FTCA did not waive sovereign immunity with respect to claims of servicemen arising out of activities incident to or arising out of their military service. The *Feres* Court considered three separate cases, two claims of medical malpractice and the claimed negligent quartering of a serviceman in a barracks containing a defective heating unit. All three presented the same basic question: whether a serviceman who sustained injury due to the negligence of others in the armed forces could maintain suit under the FTCA. The Court recognized its task as one of statutory interpretation, stating: "The only issue of law raised is whether the Tort Claims Act extends its remedy to one sustaining 'incident to the service' what under other circumstances would be an actionable wrong." 340 U.S. at 138, 71 S.Ct. at 155. After carefully considering the limited legislative history on point, the *Feres* Court concluded that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." 340 U.S. at 146, 71 S.Ct. at 159. Since much of the government's immunity defense turns on the Supreme Court's decision in *Feres*, a more detailed analysis of that case is appropriate.

At the outset, the *Feres* Court recognized the difficulty of interpreting a statute having so little legislative history:

> There are few guiding materials for our task of statutory construction. No committee reports or floor debates disclose what effect the statute was designed to have on the problem before us, or that it even was in mind. Under these circumstances, no conclusion can be above challenge, but if we misinterpret the Act, at least Congress possesses a ready remedy.

340 U.S. at 138, 71 S.Ct. at 155.

Digging deeper, the Court uncovered two clues to Congress' intent in enacting the FTCA. First, because the relationship between the government and members of the armed forces is "distinctively federal in character", 340 U.S. at 143, 71 S.Ct. at 158, the Court determined that Congress did not intend the government's liability to members of the armed services to depend upon the law of the place where the soldier happened to be stationed at the time of injury:

> It would hardly be a rational plan of providing for those disabled in service by others in service to leave them dependent upon geographic considerations over which they have no control and to laws which fluctuate in existence and value.

340 U.S. at 143, 71 S.Ct. at 158.

Second, the Court examined Congress' failure to integrate a serviceman's possible remedy in tort with the statutory "no fault" compensation scheme provided under the Veterans Benefits Act and concluded that

> If Congress had contemplated that this Tort Act would be held to apply in cases of this kind [where a serviceman sued the government], it is difficult to see why it should have omitted any provision to adjust these two types of remedy [FTCA and Veterans Benefit Act] to each other. The absence of any such adjustment is persuasive that there was no awareness that the Act might be interpreted to permit recovery for injuries incident to military service.

340 U.S. at 144, 71 S.Ct. at 158.

A third factor supporting the "*Feres* doctrine" was later enunciated in *United States v. Brown*, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954), where the Supreme Court considered "[t]he peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on [military] discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty." 348 U.S. at 112, 75 S.Ct. at 143; *see also Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 671–72, 97 S.Ct. 2054, 2057, 52 L.Ed.2d 665 (1977).

■ Although it concluded that Congress did not intend to include in the FTCA's waiver of sovereign immunity injuries sustained by a serviceman incident to his service, the *Feres* Court freely admitted that the issue was not free from doubt, and it invited congressional correction by calling attention to Congress' ability to legislatively remedy any erroneous interpretation of the statute. 340 U.S. at 138, 71 S.Ct. at 155. Many courts have questioned the wisdom of the *Feres* decision,[4] but its continued vitality is beyond dispute even to them.[5] Moreover, Congress's failure for 30 years to amend the FTCA and legislatively "correct" the *Feres* holding is a *sub silentio* "acquiesc[ence] in the holding of *Feres*", *United States v. Lee*, 400 F.2d 558, 561 (CA9 1968), *cert. denied*, 393 U.S. 1053, 89 S.Ct. 691, 21 L.Ed.2d 695 (1969), that strongly suggests that the Supreme Court correctly interpreted congressional intent.[6]

■ Any doubt as to the validity of the *Feres* doctrine was laid to rest in *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), which extended the reach of the "well established doctrine of *Feres v. United States*" to third party claims against the government, 431 U.S. at 670, 97 S.Ct. at 2057, see discussion, *infra*.[7] Even the Third Circuit Court of Appeals, the court most critical of the *Feres* doctrine,[8] concedes *Feres*' continuing validity and broad application:

Although the current climate of academic and judicial thought finds governmental immunity from suit in disfavor, a plausible explanation appears for its continued application to members of the armed forces injured while in the course of active duty, regardless of whether that injury is caused by the negligence of a superior officer or by a direct command. If claims for injuries sustained by members of the armed forces in the execution of military orders were subjected to the scrutiny of courts of justice, then the civil courts would be required to examine and pass upon the propriety of military decisions. The security and common defense of the country would quickly disintegrate under such meddling. "[A]ctions and essential military discipline would be impaired by subjecting the command to the public criticism and rebuke of any member of the armed forces who chose to bring a suit against the United States". *Jefferson v. United States*, 178 F.2d 518, 520 (4th Cir. 1949), *aff'd sub nom. Feres v. United States*, 340 U.S. 135 [71 S.Ct. 153, 95 L.Ed. 152] (1950) Even if we were inclined to reconsider the doctrine in connection with an injury sustained as a result of a deliberate military command, we are foreclosed from so doing by the Supreme Court's recent reiteration of the doctrine, although in a different context in *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

4. *See, e. g., Peluso v. United States*, 474 F.2d 605, 606 (CA3), *cert. denied*, 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973) ("If the matter were open to us we would be receptive to appellants' argument that *Feres* should be reconsidered, and perhaps restricted"); *Thomason v. Sanchez*, 398 F.Supp. 500, 503 (D.N.J. 1975) ("we previously expressed reservations about the continued validity of the broad *Feres* doctrine. Upon reconsideration we reiterate that concern.")

5. *See Peluso v. United States, supra*, at 606 ("[*Feres*] is controlling. Only the Supreme Court can reverse it."); *Thomason v. Sanchez*, 539 F.2d 955, 957 (CA3 1976) ("[W]e are powerless to jettison Feres or to dislodge it sufficiently to create an exception [here].") *See also Watkins v. United States*, 462 F.Supp. 980 (S.D.Ga.1977), *aff'd on opinion below*, 587 F.2d 279 (CA5 1979).

6. This conclusion follows even though later decisions have repudiated some of the clues to intent that the Supreme Court relied upon in reaching that decision. *See Schwager v. United States*, 279 F.Supp. 262, 263 (E.D.Pa.1968).

7. *See also Jaffee v. United States*, 592 F.2d 712, 717 (CA3 1979), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); *Dilworth v. United States*, 387 F.2d 590, 591 (CA3 1967); *Buckingham v. United States*, 394 F.2d 483, 484 (CA4 1968).

8. *See e. g., Thomason v. Sanchez*, 539 F.2d 955 (CA3 1976); *Peluso v. United States*, 474 F.2d 605 (CA3), *cert. denied*, 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973).

*Jaffe v. United States,* 592 F.2d 712, 717 (CA3 1979) (citations and footnote omitted).

## C. THIRD PARTY ACTIONS AGAINST THE GOVERNMENT

■ The same court that determined in *Feres* that the FTCA did not waive sovereign immunity with respect to claims by servicemen arising out of activities incident to their military service also decided *United States v. Yellow Cab Company,* 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951), which held that the FTCA permits a tort defendant to implead the United States as a third party defendant under a theory of indemnity or contribution. This created a new question: whether such a third party claim may be maintained when plaintiff's direct claim against the government would be barred by the principles of *Feres.*

The Supreme Court did not consider this question until 1977, when, in *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), it resolved the "tension between *Feres* and *Yellow Cab*" by holding that third party claims against the government are barred

> for essentially the same reasons that the direct action [against the government by plaintiff] is barred by *Feres.* * * * [T]he right of a third party to recover in an indemnity action against the United States recognized in *Yellow Cab,* must be held limited by the rationale of *Feres* where the injured party is a serviceman.

431 U.S. at 670, 673–4, 97 S.Ct. at 2058. To permit recovery against the government, the Court observed, "would be to judicially admit at the back door that which has been legislatively turned away at the front door". 431 U.S. at 673, 97 S.Ct. at 2058, *quoting Laird v. Nelms,* 406 U.S. 797, 802, 92 S.Ct. 1899, 1902, 32 L.Ed.2d 499 (1972).

## D. *FERES/STENCEL* IN THE CONTEXT OF THIS ACTION

To the extent that plaintiffs' complaints seek recovery against the defendant chemical companies, of course, the *Feres* doctrine has no application. 1 Jayson, *Handling Federal Tort Claims* § 155.02 at 5–66 n.9 and 5–77 n.24. Under *Stencel Aero Engineering Corp. v. United States,* however, any damages recovered by plaintiffs against defendants that plaintiffs could not recover directly from the United States may not be the subject of a third party complaint against the United States. 1 Jayson, *Handling Federal Tort Claims* § 164 at 5–220.

> [N]either contribution nor indemnity may succeed without the support of the initial negligence. * * * [A]s the claimed contribution and indemnity must depend for success upon the alleged negligence of the Government towards plaintiffs, and that is a negligence which is not actionable, the claim must fail. *Drumgoole v. Virginia Electric and Power Company,* 170 F.Supp. 824, 825–26 (E.D.Va.1952).

*See also Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977); *Certain Underwriters at Lloyds v. United States,* 511 F.2d 159 (CA5 1975); *Barr v. Brezina Construction Company,* 464 F.2d 1141 (CA 10 1972). For the sake of clear presentation in this opinion, however, the court will consider plaintiffs' claims as if they were asserted directly against the United States government, for, to the extent that plaintiffs may not maintain actions directly against the government, under the principles of *Stencel Aero,* the defendants' third party claims against the government must fall as well.[9]

■ At the outset, it is clear that *Feres* applies to suits against individual servicemen,[10] claims by servicemen who served in

---

9. For convenience the court will refer to the principle that the government is immune from third party claims that would be barred by *Feres* if directly asserted against the government as "Feres/Stencel".

10. *Tirrill v. MacNamara,* 451 F.2d 579 (CA9 1971); *Bailey v. DeQuevedo,* 375 F.2d 72 (CA3 1967), *cert. denied,* 389 U.S. 923, 88 S.Ct. 247, 19 L.Ed.2d 274 (1967); *Misko v. United States,* 453 F.Supp. 513, 514 (D.D.C.1977), *aff'd,* 593 F.2d 1371 (C.A.D.C.1979); *Pisciotta v. Ferrando,* 428 F.Supp. 685, 686 (S.D.N.Y.1977).

Vietnam,[11] claims of intentional torts,[12] and claims styled as constitutional torts.[13] This leaves two issues: first, whether the court should apply the principles of *Feres/Stencel* to this action at all; and second, whether plaintiffs' injuries arose out of or were suffered "in the course of activity incident to service." *Feres v. United States*, 340 U.S. at 146, 71 S.Ct. at 159.

## E. SHOULD *FERES/STENCEL* APPLY TO THIS ACTION?

The government seeks to dismiss the third party complaints on the ground that the claims of the defendant chemical companies are barred by a straightforward application of *Feres/Stencel* principles. Defendants, however, argue that the court should undertake "a detailed and fresh examination of the rationale underlying those holdings [*Feres* and *Stencel*] in the light of other great and * * * superceding policy considerations", Hercules/Diamond Shamrock/Monsanto Memorandum at 10, to determine if the *Feres* doctrine should be applied in this case.[14] In support, defendants cite the "number of occasions [the Supreme Court has] reexamined and redefined or abandoned certain reasons for its holding in [the *Feres*] case." Hercules/Diamond Shamrock/Monsanto Memorandum at 7.[15]

■ Defendants' attempts to reargue the underlying rationale of *Feres* must be rejected, however, for two reasons. First, *Feres* was a case of statutory interpretation. 340 U.S. at 138, 71 S.Ct. at 155. *Adams v. General Dynamics Corp.*, 385 F.Supp. 890, 891 (N.D.Cal.1974), aff'd, 535 F.2d 489 (CA9), cert. denied, 432 U.S. 905, 97 S.Ct. 2949, 53 L.Ed.2d 1077 (1976). Even were this court to believe the Supreme Court's reasoning to be erroneous,[16] neither the Court nor Congress itself has altered *Feres'* basic holding, that in enacting the FTCA Congress did not intend to waive sovereign immunity with respect to injuries or loss suffered by servicemen in the course of activity incident to their service.[17]

11. *Rotko v. Abrams*, 338 F.Supp. 46, 47 (D.Conn.1971), aff'd, 455 F.2d 992 (CA2 1972); 1 Jayson, *Handling Federal Tort Claims* § 155.-08[4][i] at 5–138.

12. *Citizens National Bank of Waukegan v. United States*, 594 F.2d 1154 (CA7 1979); *Jaffe v. United States*, 592 F.2d 712 (CA3 1979), cert. denied, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); *Everett v. United States*, 492 F.Supp. 318, 321 (S.D.Ohio 1980); *Schmid v. Rumsfeld*, 418 F.Supp. 19, 21 (N.D.Cal.1979).

13. *Everett v. United States*, 492 F.Supp. 318, 322 (S.D.Ohio 1980); *Nagy v. United States*, 471 F.Supp. 383, 384 (D.D.C.1979); *Misko v. United States*, 453 F.Supp. 513, 515 (D.D.C. 1978), aff'd, 593 F.2d 1371 (C.A.D.C.1978); *Calhoun v. United States*, 475 F.Supp. 1, 4–5 (S.D. Cal.1977), aff'd on opinion below, 604 F.2d 647 (CA9 1979), cert. denied, 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 761 (1980).

14. *See also* Dow's Memorandum at 28; Thompson-Hayward's Memorandum at 12; Hooker's Memorandum at 6.

15. *See also* Dow's Memorandum at 16.

16. Although some of the principles relied upon by the *Feres* Court have since been discredited or repudiated, *see* 1 Jayson, *Handling Federal Tort Claims*, § 155.05 at 5–86 through 5–91, much of the Court's reasoning remains valid and persuasive. *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 672–73, 97 S.Ct. 2054, 2058, 52 L.Ed.2d 665 (1977); *Jaffe v. United States*, 592 F.2d 712, 717 (CA3 1979), cert. denied, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); *Coffey v. United States*, 324 F.Supp. 1088, 1087, 1088 (S.D.Cal.1971), aff'd, 455 F.2d 1380 (CA9 1972).

17. That Congress, despite ample opportunity, has failed to right any possible judicial misinterpretation indicates the soundness of the *Feres* conclusion regardless of whether specific elements of the Court's reasoning remain valid. *See United States v. Lee et al.*, 400 F.2d 558 (CA9 1968), cert. denied, 393 U.S. 1053, 89 S.Ct. 691, 21 L.Ed.2d 695 (1969), wherein the court found that

Congress has acquiesced in the holding of *Feres* [by] permitting the decision to remain undisturbed for eighteen years. * * * "[W]hen the questions are of statutory construction, not of constitutional import, Congress can rectify our mistake, if such it was, or change its policy at any time, and in these circumstances reversal is not readily to be made.

400 F.2d at 561, quoting *United States v. South Buffalo Railway Company et al.*, 333 U.S. 771, 774–75, 68 S.Ct. 868, 870, 92 L.Ed. 1077 (1948).

The reasoning of *Lee* is now twelve years stronger.

Second, in holding the government immune from claims by servicemen the Supreme Court was concerned with more than the effects of servicemen recovering against the government; the Court was also concerned about the disruptive effects caused by the very commencement of actions by servicemen complaining about the conduct of superiors. As the Court later observed in *United States v. Brown*, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954):

> The peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if such suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty, led the [Feres] Court to read [the Federal Tort Claims] Act as excluding claims of [servicemen for injuries incident to their service]. 348 U.S. at 112, 75 S.Ct. at 143.

Thus, it is the suit itself as much as the possibility of recovery, that the Supreme Court feared would disrupt military discipline and the orderly conduct of military affairs. *Henninger v. United States*, 473 F.2d 814, 815–16 (CA9), *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973). To reexamine the *Feres* rationale in light of the circumstances of this case as defendants suggest, would itself defeat one of the very factors defendants seek to have the court reconsider. As the Supreme Court noted long ago in discussing the relationship between a soldier and his superiors:

> An army is not a deliberate body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier. Vigor and efficiency on the part of the officer and confidence among the soldiers in one another, are impaired if any question be left open as to their attitude to each other. *United States v. Grimley*, 137 U.S. 147, 153, 11 S.Ct. 54, 55, 34 L.Ed. 636 (1890).

For these reasons, this court will neither reconsider the underlying rationale of the *Feres* decision nor weigh the circumstances here presented against the "*Feres* factors".[18] Right or wrong, the Supreme Court's conclusion that Congress did not intend passage of the FTCA to act as a waiver of sovereign immunity as to claims of servicemen injured incident to their service remains the law of the land. The *Feres/Stencel* doctrine bars defendants' attempt to seek contribution or indemnity from the United States based on any recovery plaintiffs may obtain for injuries that arose out of or were suffered incident to service.

## F. DID PLAINTIFFS' INJURIES ARISE OUT OF OR INCIDENT TO MILITARY SERVICE?

The second issue is whether the claims of particular plaintiffs arose out of or in the course of activity incident to service. As Professor Jayson has noted, "neither the [Federal Tort Claims] Act nor the opinions of the Supreme Court have indicated definitively the full meaning of the phrase 'incident to service'". 1 Jayson, *Handling Federal Tort Claims* § 155.01 at 5–65.[19] This lack of definition complicates the task of applying the standard considerably, 1 Jayson *Handling Federal Tort Claims* § 155.01

---

**18.** Other courts have rejected similar attempts to reargue the "*Feres* factors" on a case-by-case basis. *See e. g., Torres v. United States*, 621 F.2d 30, 32 (CA7 1980) (*Feres* applies even without nexus between military discipline and injury); *Joseph v. United States*, 505 F.2d 525, 527 (CA7 1974) (denial of veterans benefits "completely independent" from consideration of applicability of *Feres* doctrine); *Henninger v. United States*, 473 F.2d 814, 815–16 (CA9), *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973) (although negligence at discharge does not affect military discipline, *Feres* still applies); *Healy v. United States*, 192

F.Supp. 325, 328 (S.D.N.Y.1961), *aff'd on opinion below*, 295 F.2d 958 (CA2 1961) (availability of veterans benefits not controlling); *Morgan v. United States*, 366 F.Supp. 938, 939 (N.D.Fla.1973) (*Feres* bars claim even though plaintiff not subject to military discipline at time of injury); *see also*, 1 Jayson, *Handling Federal Tort Claims* § 155.02 at 5–74.

**19.** "The *Brooks-Feres-Brown* line of cases illustrates that the incident to service test is not easy to define and apply." *Woodside v. United States*, 606 F.2d 134, 141 (CA6 1979).

at 5–65, but certain principles do emerge from an examination of the cases.

### 1. General Principles

■ First, the phrase "incident to service" is not to be narrowly applied or "restricted to actual military operations such as field maneuvers or small arms instruction." *Hass v. United States*, 518 F.2d 1138, 1141 (CA4 1975). Rather, "incident to service" is a broad concept that depends on a rational connection between the plaintiff's claim or loss and his status as a member of the armed forces. *Woodside v. United States*, 606 F.2d 134, 141 (CA6 1979); *Harten v. Coons*, 502 F.2d 1363, 1365 (CA 10 1974), *cert. denied*, 420 U.S. 963, 95 S.Ct. 1354, 43 L.Ed.2d 441 (1975). Professor Jayson summarizes this concept:

> [I]f the serviceman's injury or loss, when viewed in all the surrounding circumstances, has a real and substantial relationship to his military service, it will be regarded as incident to service and consequently barred under the *Feres* doctrine. 1 Jayson, *Handling Federal Tort Claims* § 155.02 at 5–66.[20]

■ Second, the cases applying the *Feres* doctrine emphasize that "it is the *status* of the claimant as a serviceman rather than the legal theory of his claim which governs." *Rotko v. Abrams*, 338 F.Supp. 46, 47 (D.Conn.1971) (emphasis added), *aff'd on opinion below*, 455 F.2d 992 (CA2 1972).[21] Thus, the *Feres* doctrine has barred the claims of off duty servicemen injured before leaving their military base, *Watkins v. United States*, 462 F.Supp. 980, 988–89

(S.D.Ga.1977), *aff'd on opinion below*, 587 F.2d 279 (CA5 1979), of off duty serviceman injured while "hitching" a ride home on military aircraft, *Archer v. United States*, 217 F.2d 548, 552 (CA9 1954), *cert. denied*, 348 U.S. 953, 75 S.Ct. 441, 99 L.Ed. 745 (1955); *Homlitas v. United States*, 202 F.Supp. 520 (D.Ore.1962); *Fass v. United States*, 191 F.Supp. 367 (E.D.N.Y.1961), and the wrongful death claim of the widow of a serviceman killed in an air crash while receiving flight instruction toward a commercial pilot's license. *Woodside v. United States*, 606 F.2d 134 (CA6 1979).

■ Third, at the time of his injury plaintiff need not be on any military mission. *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (serviceman died when barracks he was sleeping in burned due to defective heating unit),[22] nor subject to military discipline, *Hall v. United States*, 451 F.2d 353, 354 (CA1 1971) (no "connection between the activity which injured plaintiff and [military] discipline" necessary).[23]

Professor Jayson concisely and fairly synthesizes the "incident to service" cases as follows:

> The duty status of the serviceman-claimant is of particular significance in determining whether the injury or loss was incident to service. The [Supreme Court's rationale in *Feres/Stencel*] applies to almost every situation which can be envisaged in which the injury or loss was sustained by a serviceman while on duty (as distinguished from one who is on

---

**20.** See also *Healy v. United States*, 192 F.Supp. 325, 327 n.8 (S.D.N.Y.1961), *aff'd*, 295 F.2d 958 (CA2 1961) ("special soldier-Government relationship which embraces the incident-to-service concept covers those wrongs which, although not sustained in the course of active duty, are so closely related to it that they may be deemed 'incident' to that duty"); 1 Jayson, *Handling Federal Tort Claims* § 155.02 at 5–79 through 5–80 ("in order for a claim to be service-incident, there does not have to be any proximate causation in the common-law tort sense, between the military service or employment and the damage. All that is required is that as an incident of his service or employment the claimant is placed in a position where he is surrounded with conditions giving rise to the claim").

**21.** See also *U. S. v. Lee*, 400 F.2d 558, 562 (CA9 1968), *cert. denied*, 393 U.S. 1053, 89 S.Ct. 691, 21 L.Ed.2d 695 (1969); *Knoch v. United States*, 316 F.2d 532, 534 (CA9 1963); *Frazier v. United States*, 372 F.Supp. 208, 210 (M.D.Fla.1973).

**22.** See also *Hass v. United States*, 518 F.2d 1138, 1141 (CA4 1975) (*Feres* bars claim of off-duty serviceman injured while riding a dangerous horse rented from a Marine Corps stable).

**23.** See also *Hass v. United States*, 518 F.2d 1138, 1140 (CA4 1975); *James v. United States*, 358 F.Supp. 1381, 1385 (D.R.I.1973), *aff'd*, 530 F.2d 962 (CA1), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976).

leave or furlough), and it seems safe to say that the *Feres* doctrine will always apply in such circumstances. 1 Jayson, *Handling Federal Tort Claims* § 155.02 at 5–69 through 5–71.

[I]f the serviceman's injury or loss occurs while he is off duty, while he is not within the physical confines of his military base, while he is not engaged in any military mission, and is not directly under military discipline, it is likely that the *Brooks* doctrine allowing Tort Claims Act recovery will apply;[24] in other words, that the injury or loss will be regarded as not incident to service. It should be noted, however, that the application of *Brooks* generally requires all of the mentioned factual elements to be present. Contrariwise, if the injury or loss occurs while the serviceman is on duty, or—without regard to whether he is on or off duty—if it occurs on the military base where he is stationed or on a military aircraft where he is directly under military control and discipline, or if it occurs while he is engaged in a military mission, it is likely that the *Feres* doctrine excluding the claim will apply. Again speaking generally, the presence of any one of the mentioned factual elements will bring application of the *Feres* doctrine. Jayson, *Handling Federal Tort Claims* § 155.02 at 5–67 through 5–68.

2. *Application of Feres/Stencel to Plaintiffs' Claims*

(a) Plaintiff Veterans' Claims of Exposure

██ The veterans' claims of injury clearly arise from their alleged exposure to Agent Orange during their military service. While virtually all of the veterans allege that their exposure took place in southeast Asia as a direct result of government efforts to defoliate the forests during the Vietnam war, the circumstances of each veteran's claimed exposure may vary. Some claim to have been directly sprayed with Agent Orange; some claim to have come into contact with Agent Orange as a result of being transported through sprayed areas; others claim to have been exposed to Agent Orange by ingesting water or food contaminated with the herbicide; and still others claim exposure during the transportation and handling of Agent Orange or its containers.

Whatever the facts surrounding a particular veteran's claim of exposure may be,[25] each veteran's presence in southeast Asia resulted solely from their military service, and, as to each veteran, "as an incident to his service or employment [he was] placed in a position where he [was] surrounded with conditions giving rise to the claim" of exposure. *See* 1 Jayson *Handling Federal Tort Claims* § 155.02 at 5–78 through 5–79. Even veterans who claim injury as the result of exposure to Agent Orange while off duty are within the parameters of the *Feres* doctrine because "when viewed in all the surrounding circumstances", a veteran's exposure in southeast Asia to a herbicide used for military purposes "has a real and substantial relationship to his military service * * * and consequently [his claim] is barred under the *Feres* doctrine." 1 Jayson, *Han-*

---

24. In *Brooks v. United States*, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949), the Supreme Court held that a serviceman may recover under the FTCA on claims which have no relationship to his military service. Anticipating the issues ultimately considered in *Feres* one term later, the Court stated:

we are dealing with an accident which had nothing to do with the Brooks' army careers, injuries not caused by their service except in the sense that all human events depend upon what has transpired. Were the accident incident to the Brooks' service, a wholly different

case would be presented. We express no opinion as to it * * *. 337 U.S. at 52, 69 S.Ct. at 920.

25. Defendants' attempts in connection with this motion to require individual factual hearings on the circumstances of each veteran's exposure to Agent Orange must be rejected. Such rejection, however, does not preclude later examination of individual plaintiffs concerning the circumstances of their exposure to the extent that they may bear on other issues, *e. g.,* individual liability or damage questions.

*dling Federal Tort Claims* § 155.02 at 5–66.[26]

The analysis is similar for those veterans who claim that their exposure to Agent Orange occurred within the United States or places other than southeast Asia during their military service. Their handling, transportation or distribution of Agent Orange during the course of their military duties was incident to their service, and their claims are equally barred under the *Feres* doctrine.

(b) Post-Discharge Failure to Warn

Only one of plaintiff veterans' claims does not fall easily under this analysis, i. e., that defendants breached a post-discharge duty to the veterans by failing to notify them of new scientific information concerning the possible harm that could result from exposure to Agent Orange. Plaintiff veterans allege that defendants' failure to inform them of possible dangers associated with exposure to Agent Orange prevented them from seeking more frequent medical examinations and thereby insuring early detection and treatment of disease. Defendants seek indemnity and contribution from the government on this claim too.

Defendants rely on three cases in opposition to the government's motion to dismiss these "post-discharge" claims: *Schwartz v. United States*, 230 F.Supp. 536 (E.D.Pa. 1964); *Thornwell v. United States*, 471 F.Supp. 344 (D.D.C.1979); *Everett v. United States*, 492 F.Supp. 318 (S.D.Ohio 1980).

In *Schwartz v. United States* a serviceman treated for a sinus condition during the course of his military service had a radioactive dye, umbrathor, inserted into his sinus. After discharge from the military, plaintiff sought additional medical treatment for his sinus difficulties, but the Veterans Administration hospital that considered his treatment failed to obtain and examine his medical records, and, as a result of the hospital's negligence, the contin-

ued presence of the earlier-inserted umbrathor went undetected. As a result plaintiff contracted cancer. The court held that *Feres* did not bar plaintiff's claim against the government, because plaintiff's claim of negligence lay not in the original insertion of the umbrathor at the time he was in the military; rather, the court found that the actionable negligence was the hospital's failure to take reasonable steps to diagnose and solve plaintiff's problem, the continued presence of the umbrathor in his sinus. 230 F.Supp. at 539–40. The court further opined that the government was negligent for its failure to followup its umbrathor patients in order to inform them of newly discovered dangers associated with the drug. 230 F.Supp. at 540.

In the second case relied on by the defendants, *Thornwell v. United States*, a former serviceman alleged that he was intentionally drugged with LSD as part of a secret government experiment and that the government negligently failed to warn plaintiff that his exposure to the drug subjected him to certain medical risks. The *Thornwell* court, noting the difficulties that courts encounter when the acts complained of commence while plaintiff is on active duty and then continue until well after discharge, 471 F.Supp. at 350, held that Thornwell's claim against the government was not barred by the principles of *Feres* because he did not allege merely continuing negligence. Rather,

[h]e claim[ed] that he was *intentionally* harmed while he was on active duty and he further claim[ed] that, after he became a citizen [left the military], the defendants failed to exercise their duty of care by neglecting to rescue him from the position of danger which they had created, * * * two distinctly separate patterns of conduct, one intentional and [one] negligent. 471 F.Supp. at 351.

---

26. *See also Woodside v. United States*, 606 F.2d 134, 141 (CA6 1979) ("Where the two [the injury causing activity and the Armed Forces] are closely associated or naturally related, the activity will be deemed "incident to service" even though not an essential or integral part of the mission of the Armed Forces and even though not directly involving a command relationship between the soldier and the military").

The *Thornwell* court then found that plaintiff had alleged "two entirely different torts", and since the "complaint [was] perfectly clear in its allegation that the negligent act occurred, *in its entirety*, after [plaintiff] attained civilian status", 471 F.Supp. at 351 (emphasis in original), plaintiff's claim of governmental negligence was not barred by *Feres. Id.* The *Thornwell* court divided the cases involving servicemen's claims of post-discharge negligence into three types:

> To summarize the relevant precedent, it appears that there are three types of personal injury cases which involve post-discharge negligence. In the first case, the military performed separate negligent acts (i. e., two improper operations), one before, and one after, discharge; *United States v. Brown*, 348 U.S. 110 [75 S.Ct. 141, 99 L.Ed. 139], and *Hungerford v. United States*, 192 F.Supp. 581 (N.D. Cal.1961), *rev'd on other grounds*, 307 F.2d 99 (9th Cir. 1962), both clearly indicate that the injured veteran may recover for the later act. In the second case, a single negligent act occurs and its effects linger after discharge; *Feres v. United States*, 340 U.S. 135 [71 S.Ct. 153, 95 L.Ed. 152] (1950), holds that, under some circumstances, this one act is subject to intra-military immunity. Third, the military may commit an intentional act and then negligently fail to protect a soldier turned civilian from the dire consequences which will flow from the original wrong. This Court holds that, under such circumstances, the injured civilian may have a valid claim against the tort feasors. The later negligence is a separate wrong, a new act or omission occurring after civilian status is attained; the perpetrators of this wrong must be held accountable for their conduct. 471 F.Supp. at 352.

In defendants' third case, *Everett v. United States*, 492 F.Supp. 318 (S.D.Ohio 1980), the wife of a deceased serviceman sued the government claiming that her husband's death by cancer was the result of his being intentionally exposed to large doses of radiation when he was forced to partici-

pate as an Air Force enlisted man in military maneuvers in a nuclear blast area less than one hour after detonation of the nuclear device. Plaintiff argued that her husband's march through the hazardous area was part of an experimental project to test the effects of nuclear radiation. Refusing to dismiss plaintiff's claim of post-discharge negligence, the *Everett* court found that the fact picture "properly falls in the third category" of the *Thornwell* analysis—intentional act incident to service, plus a separate wrong of post-discharge negligence. 492 F.Supp. at 325.

 These cases are distinguishable from the facts at bar in several important respects. First, unlike the *Schwartz* case, the post-discharge negligence asserted here is not separate and distinct from the numerous acts of negligence alleged to have occurred incident to plaintiff's service. Schwartz, who sought medical treatment after his discharge, had a predischarge condition that was improperly diagnosed and negligently treated after discharge. That the condition arose due to government installation of the umbrathor in plaintiff's sinus while he was a serviceman does not alter the fact that the governmental negligence occurred, in its entirety, long after plaintiff became a civilian. Unsupported dicta aside, *Schwartz* stands only for the proposition that recovery for negligent performance of post-discharge medical treatment is not barred merely because the original condition arose from medical treatment that is not actionable under *Feres.*

Thus, *Schwartz* properly falls under *Thornwell's* "first case", where "the military performed separate negligent acts (i. e., two improper operations), one before, and one after, discharge". 471 F.Supp. at 352. Here, plaintiff's claim of post-discharge failure to warn does not present a separate and distinct act of post-discharge negligence on the part of the government. Of course, any veteran in this case who faces a situation analogous to *Schwartz*, that is, who seeks post-discharge medical assistance from the government for an

Agent Orange related malady and is negligently treated at a government hospital, may prosecute his claim for negligent treatment without the *Feres* impediment.

Second, unlike the *Thornwell* and *Everett* cases, plaintiffs here do not allege that the government caused them intentional harm by subjecting them to a form of human experimentation. *Thornwell*, joined by *Everett*, emphasized the distinction between cases of predischarge torts that were intentional and those that were negligent:

> Mr. Thornwell * * * does not allege a mere continuing negligent omission [which would be barred by *Feres*]. He claims he was *intentionally* harmed while he was on active duty and he further claims that, after he became a civilian, the defendants failed to exercise their duty of care by neglecting to rescue him from the position of danger which they had created. * * * Mr. Thornwell's claims for in-service, and out-of-service, injuries, certainly involve two distinctly separate patterns of conduct, one intentional and [one] negligent. 471 F.Supp. at 351 (emphasis in original)

Thus, both the *Thornwell* and *Everett* courts were presented with the "third case" in the *Thornwell* analysis, where the military "commit[s] an intentional act and then negligently fail[s] to protect a soldier turned civilian from the dire consequences which will flow from the original [intentional] wrong." 471 F.Supp. at 352. Here, the parties do not dispute that the government's motives in using Agent Orange in southeast Asia were valid military objectives: defoliate jungle growth to deprive enemy forces of ground cover and destroy enemy crops to restrict enemy's food supplies. Unlike *Thornwell* and *Everett*, plaintiffs here do not allege that the government committed "an intentional act and then negligently fail[ed] to protect [them]", *Thornwell v. United States*, 471 F.Supp. at 352; *Everett v. United States*, 492 F.Supp. at 325. Accordingly, the facts at bar do not present the "third case" of the *Thornwell* analysis.

If this case fits within the *Thornwell* analysis at all, it is the "second case", where "a single negligent act occurs and its effects linger after discharge." 471 F.Supp. at 352. Despite all the inconsistencies pervading this difficult area of analysis, "it is clear, at the very least, that a mere act of negligence which takes place while the plaintiff is on active duty and which then remains uncorrected after discharge, is not grounds for suit". *Thornwell v. United States*, 471 F.Supp. at 351.

Plaintiffs' complaints here neither allege nor support a conclusion that the post-discharge failure to warn was sufficiently separate and distinct from the underlying "incident to service" tort claims. Moreover, the *Feres* doctrine bars claims that are not only "incident to service" but also those which, like these, "arise out of" military service. The injuries here alleged are "inseparably entwined" with, and directly related to, plaintiffs' military service, *see Healy v. United States*, 192 F.Supp. 325, 328 (S.D.N.Y.1961), *aff'd on opinion below*, 295 F.2d 958 (C.A.2, 1961); *Kilduff v. United States*, 248 F.Supp. 310, 312 (E.D.Va.1960); 1 Jayson, *Handling Federal Tort Claims* § 155.08[3][b] at 5–124. The important and well established principles of the *Feres* doctrine cannot be circumvented by inventive presentation or artful pleading which attempts to create an actionable post-discharge claim out of what is in reality a claim of continuing neglect. *See Thornwell v. United States*, 471 F.Supp. at 352.

(c) The Australian Veterans' Claims

■ The above analysis applies with equal force to the claims of the Australian veterans.[27] The only reported case on point, *Daberkow v. United States*, 581 F.2d 785 (C.A.9, 1978), reached a similar conclusion. There, the claims of a West German serviceman, killed performing duties incident to joint military activity conducted by the United States and West German

---

27. In *McMillan v. Dow*, CV 80–1143 (EDNY GCP), and *Elder v. Dow*, CV 80–1241 (EDNY GCP), 270 plaintiffs, all claiming to have been

Australian war veterans who had served jointly with American Forces in Vietnam, seek damages for injuries caused by Agent Orange.

governments, were held barred under *Feres*. The *Daberkow* court undertook an analysis of the three "*Feres* factors" and concluded that *Feres* applies with equal force to foreign servicemen injured incident to joint military activities because: (1) the scope of the United States government's liability should not depend on the fortuity of the location of any serviceman's duty station, whether that serviceman is an American or foreign serviceman; (2) the foreign government there involved had provided a means of compensating veterans and their families for injuries incident to service; and (3) the possible disruption of military discipline resulting from servicemens' claims is similar whether the serviceman is American or not. 581 F.2d at 788.

Here, the claims of the Australian plaintiffs clearly fall within the *Daberkow* analysis. The Australian plaintiffs concede that their presence in southeast Asia during the period in question was the direct result of their country's participation in joint military operations with the United States, memorandum of Australian plaintiffs at 3, and they acknowledge the existence of a compensation scheme for Australian veterans similar to that provided by the United States government. Memorandum of Australian plaintiffs at 8. Moreover, to rule that the United States government has waived sovereign immunity with respect to the tort claims of foreign servicemen but not with respect to the claims of American servicemen would distort the underlying purposes of the FTCA, defy common sense, and almost certainly be contrary to the intent of an elected Congress. Since the court determines that the Australian veterans could not maintain an action directly against the United States, defendants in turn may not maintain their third party action for indemnity or contribution based on any recovery the Australian veterans may obtain from them. *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977).

(d) Derivative Claims of Spouses, Parents and Children

 Although the *Feres* doctrine does not apply to the servicemen's next of kin insofar as their own direct injuries or deaths are concerned, 1 Jayson, *Handling Federal Tort Claims* § 156 at 5–142 through 5–143 and cases cited therein, *Feres* does bar suits by a serviceman's family for damages resulting from injuries the serviceman suffered incident to service, 1 Jayson, *Handling Federal Tort Claims* § 156 at 5–144, even where the derivative action is technically personal in character (e. g., wrongful death, loss of consortium). *Van Sickel v. United States*, 285 F.2d 87, 91 (CA9 1969). This principle is demonstrated by *Feres* itself, where two of the three suits barred in that decision were wrongful death actions instituted on behalf of widows of servicemen who had died from injuries suffered incident to their service. *Feres v. United States, United States v. Griggs*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). (Deciding appeals from *Feres v. United States*, 177 F.2d 535 (CA2 1949), and *Griggs v. United States*, 178 F.2d 1 (CA 10 1949)).

Further, application of this rule bars claims of mental anguish suffered by family members, *DeFont v. United States*, 453 F.2d 1239, 1240 (CA1 1972), *cert. denied*, 407 U.S. 910, 92 S.Ct. 2436, 32 L.Ed.2d 684 (1972) (wife's mental anguish over inadequate care provided serviceman husband not separate and distinct claim under *Feres*), and also bars the claims of veterans' spouses who allege damages that actually were the result of harm done to servicemen, *Harten v. Coons*, 502 F.2d 1363, 1365 (CA 10 1974), *cert. denied*, 420 U.S. 963, 95 S.Ct. 1354, 43 L.Ed.2d 441 (1975) (mother of accidentally conceived child cannot recover for negligent vasectomy performed on serviceman husband).

Applying these principles to the case at bar, it is clear that members of the veterans' families may not maintain actions against the United States based on their derivative claims (e. g., loss of society, comfort, companionship, services, consortium, guidance and support), or claims that result from a serviceman's injury (e. g., miscarriage). Accordingly, under the principles of *Stencel Aero*, the defendants may not seek

indemnity or contribution from the United States for any liability imposed on them for claims of this nature.

(e) Claims of Direct Injury to Veterans' Children

Only the veterans' children's claim of direct injury requires additional analysis. Here, children of Vietnam veterans allege that they have suffered genetic and somatic injury as a result of a parent having been exposed to Agent Orange. This presents the difficult question of whether the injuries suffered by these children, who are not and never were members of the military, are derivative injuries suffered "incident to or arising out of military service", or whether they are direct injuries independent of those of their parents.

The closest precedent is *Monaco v. United States*, No. C 79–0860 (N.D.Cal. Nov. 2, 1979), where plaintiff, the daughter of a serviceman exposed to radiation during his military service, claimed the government's negligence towards her father caused her to be affected with "chromosomal and genetic change" which in turn resulted in her being born with a birth defect. *Monaco v. United States*, slip op. at 3. There, the court held that "[t]he test of *Feres* is whether plaintiff's injuries have as their genesis injuries allegedly sustained incident to the performance of military service", slip op. at 3, and found plaintiff's claim barred under this standard because "[plaintiff's] injuries are directly related to and arise out of the injury sustained by her father at the time he was a member of the United States Army." Slip op. at 4.

In the case at bar, the children's claims of genetic and physical harm are indirect because they arise only as the result of injuries to their veteran parents.[28] The injuries alleged by the children had their genesis in the exposure of their parents and, assuming that Agent Orange could produce the genetic changes alleged, the injuries were in-

flicted on the serviceman at the time of exposure. Thus, although Agent Orange may ultimately be found to have caused injuries in subsequently conceived children, those injuries, nevertheless, arose out of and were incident to the service of the parent. To hold otherwise might open the door for governmental liability to countless generations of claimants having ever diminishing genetic relationship to the person actually injured.

██ For these reasons, the court holds that the children's claims for genetic injury and birth defects from Agent Orange exposure of their veteran parents are injuries suffered "incident to and arising out of service" under *Feres* and cannot be recompensed in an action maintained directly against the government. Consequently, the defendants may not seek indemnity or contribution against the United States for any liability they ultimately may incur as a result of these claims. *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977).

## G. DEFENDANTS' REMAINING CLAIMS AGAINST THE UNITED STATES

Defendants have sought to style the remaining claims of their third party complaints in terms of constitutional deprivation and torts committed directly against them by the United States. This appears to be another exercise in pleading in an attempt to avoid statutory jurisdictional problems because, notwithstanding the defendants' characterizations, these remaining claims against the government are not tort claims; rather, they are essentially contractual in nature and must be so treated.

██ Congress has conferred on the courts jurisdiction over contract claims that is different from that over tort claims. Un-

---

**28.** Somewhat analogous is *Harten v. Coons*, 502 F.2d 1363 (CA 10 1974), *cert. denied*, 420 U.S. 963, 95 S.Ct. 1354, 43 L.Ed.2d 441 (1975), where a serviceman and his wife sued the United States for the costs of raising a child accidentally conceived after a negligent vasectomy on the husband. There, the court considered only the damage done to the husband and dismissed the complaint under *Feres* without regard to the wife's claim of independent injury. 520 F.2d at 1364.

der the Tucker Act, 28 U.S.C. § 1491, jurisdiction for any claim founded upon an express or implied contract with the United States is conferred on the Court of Claims, where cases sounding in tort may not be maintained. The United States District Courts have concurrent jurisdiction over contract claims, but only when the claim does not exceed $10,000. 28 U.S.C. § 1346(a)(2). Here, it is beyond dispute that defendants' remaining third party claims against the government involve more than the $10,000 that deprives this court of jurisdiction over them. Consequently, the government's motion to dismiss must be granted as to the remaining claims. Of course, dismissal of defendants' third party claims here is without prejudice to defendants' right to pursue their claims against the government in the proper forum.

## H. OTHER CLAIMS OF IMMUNITY

Arguing in the alternative, the United States seeks to dismiss defendants' third party complaints under three statutory exceptions to the FTCA: the combatant exception, 28 U.S.C. § 2680(j) (immunity not waived for "[a]ny claim arising out of the combatant activities of the military * * * during time of war"); the foreign country exception, 28 U.S.C. § 2680(k) (immunity not waived for "any claim arising in a foreign country"); and the discretionary function exception, 28 U.S.C. § 2680(a) (immunity continues for "act or omission of an employee of the government * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of [the government]").

Notwithstanding the apparent application of these exceptions to some of the claims here asserted, the court's determination that the *Feres/Stencel* doctrine operates to bar all tort claims advanced in the third party complaint makes it unnecessary to consider whether these exceptions do apply.

For all these reasons, the government's motion to dismiss the third party complaints is granted, and the third party complaints against the government deemed to have been made in all actions under MDL 381, are dismissed.[29]

## III. THE CASE MANAGEMENT PLAN

There have been pending for some time motions by various parties urging the court to make various orders affecting the overall management of this action, including such matters as class action treatment, summary judgment, discovery, and division of the action into various parts for pretrial and trial purposes. The court has reserved decision on all these motions pending resolution of two major questions that greatly affect how the case might be managed efficiently: (1) whether the United States was to be a party to the action, and (2) whether jurisdiction lies under federal common law or whether the principles and consequences of diversity jurisdiction must be considered. Now that both of these questions have been answered,[30] it is time to get on with orderly

**29.** Plaintiffs are cautioned that the issues here are, to some extent, novel, and the strong arguments advanced by all parties should make it clear that the views expressed and rulings made in this decision are not entirely free from doubt. Accordingly, any plaintiff who believes that [s]he may have a valid claim against the United States government in the event that one or more of the above rulings are ultimately reversed on an appeal from this court's decision, should protect his/her interests to the greatest extent possible by filing a notice of claim form (Standard Form 95) with the proper agency of the United States government and taking whatever additional steps may be necessary to protect his/her rights.

**30.** The first question is answered by the earlier part of this memorandum and order. The second question was answered by a decision and order of the Second Circuit Court of Appeals dated November 24, 1980 (Feinberg, C. J. dissenting) which held that this litigation should not be governed by federal common law, but rather must be controlled by the laws of the several states applied under diversity of citizenship principles. Technically, that question is still open because plaintiffs have filed a petition for en banc consideration by the Second Circuit. In addition, plaintiffs have indicated their desire to have the issues reviewed by the United States Supreme Court. However, enough light has now been shed on the problems to permit substantial progress in the

discovery and ultimate disposition of the litigation.

In developing the case management plan described in this section, the court has weighed and considered many problems presented by this litigation. Some of them are:

1. There are a large number of plaintiffs and potential plaintiffs who claim to have been injured by exposure to Agent Orange. There are now approximately 167 suits pending in the Eastern District of New York involving over 3,400 plaintiffs. The court has been informed that there are many thousands more who have, at the court's request and pending decision of the class action motion, refrained from bringing individual actions.

2. There are numerous chemical companies named as defendants.[31] The fact that they may have had differing degrees of involvement in manufacturing and supplying Agent Orange for the government may or may not cause differing levels of responsibility for the effects of Agent Orange on plaintiffs.

3. The present plaintiffs come from most of the 50 states and from Australia. This may require consideration of varying standards of conduct, rules of causation and principles of damages that may substantially affect the results in individual cases.

4. The causation issues are difficult and complex. Clearly this is not the "simple" type of "disaster" litigation such as an airplane crash involving a single incident, having a causation picture that is readily grasped through conventional litigation techniques, and presenting comparatively small variations among the claimants as to the effects upon them of the crash. With the Agent Orange litigation, injuries are claimed to have resulted from exposure to a chemical that was disseminated in the air over southeast Asia during a period of several years. Each veteran was exposed differently, although undoubtedly patterns of exposure will emerge. The claimed injuries vary significantly. Moreover, there is a major dispute over whether Agent Orange can cause the injuries in question, and there are separate disputes over whether the exposure claimed in each case did cause the injuries claimed. The picture is further complicated by the use in Vietnam of other chemicals and drugs that also are claimed to be capable of causing many of the injuries attributed to Agent Orange.

5. The litigation presents numerous questions of law that lie at the frontier of modern tort jurisprudence. Among them are questions of enterprise liability, strict products liability, liability for injuries that appear long after original exposure to the offending substance, and liability for so-called genetic injuries.

6. Many of the people exposed to Agent Orange may not even yet have experienced the harm it may cause.

7. Numerous scientific and medical issues are presented, and there are serious questions of whether there is adequate data to reach scientifically sound conclusions about them. There is the further question of whether legally permissible conclusions may nevertheless be reached on data that would not permit "scientific" conclusions.

8. Various agencies of the government have expressed concern but as yet have shown little tangible action about the problems claimed to have been caused by the government's use of Agent Orange.

9. There are important and conflicting public policies that run as crosscurrents through many phases of both the substantive and procedural problems of this litigation.

---

trial court regardless of future actions by the Second Circuit or the Supreme Court. Managing this case under diversity of citizenship principles is by far the more difficult route to travel, but the court feels that it can develop a plan for efficient management even without the aid of federal common law for jurisdiction and for substantive law purposes. If further review of the federal common law issue produces a change, then the remaining work of the court and of all parties will be simplified and the management plan can be easily adapted at that time.

31. *See* footnote 2 *supra.*

10. There is a wide choice available among the many procedural devices that could be used for addressing and ultimately deciding this controversy.

All of these problems are compounded by the practical realities of having on one side of the litigation plaintiffs who seek damages, but who have limited resources with which to press their claims and whose plight becomes more desperate and depressing as time goes on, and having on the other side defendants who strenuously contest their liability, who have ample resources for counsel and expert witnesses to defend them, and who probably gain significantly, although immeasurably, from every delay that they can produce.

Overarching the entire dispute is a feeling on both sides that whatever existing law and procedures may technically require, fairness, justice and equity in this unprecedented controversy demand that the government assume responsibility for the harm caused our soldiers and their families by its use of Agent Orange in southeast Asia.

Out of these and other problems it is this court's task as the transferee judge in this multidistrict litigation to supervise and manage the action so as to bring it to a "just, speedy and inexpensive determination", Rule 1 FRCP, either in this court, or if that is not possible, then in the transferor courts after completion here of as much of the litigation as may fairly and reasonably be resolved under the supervision of this single judge.

With the foregoing and other problems in mind, the court has considered a variety of possibilities for managing this multidistrict litigation. Each possibility has both advantages and disadvantages. Among the numerous possibilities are the following:

1. Transfer all actions to the Eastern District of New York for trial before this court.

a. Advantages: All parties would know precisely where they stand, and how the action would be handled. There would tend to be consistency in the results to the extent permitted by the varying applicable laws.

b. Disadvantages: Handling the cases would take the full time of this court, which would be able to handle no other cases, a result that would be unfair not only to the other judges in the Eastern District of New York who are already overburdened with one of the heaviest criminal workloads in the nation, but also to other civil litigants in the Eastern District, who would be further delayed in getting their cases to trial. Moreover, to separately try these actions would take far too long a time; probably neither the litigants nor this court would live long enough to see the last case tried.

2. Supervise all discovery, prepare a pretrial order, and then remand the cases for separate trials in the transferor districts around the country.

a. Advantages: This is by far the easiest course of action for this court to take. In many MDL cases this is an acceptable and proper technique and achieves all of the MDL benefits available to those cases. It accomplishes coordinated discovery, a single plan for processing up through the pretrial order, and a shared workload in the actual trial of the individual actions.

b. Disadvantages: This technique would require separate trials of each action in the transferor courts, a technique that would be repetitious and wasteful with respect to the issues that are common to all actions. Although testimony of key expert witnesses might be made available to each of the transferor courts through use of videotape so that the need for those witnesses to personally appear at each trial would thereby be eliminated, the opportunity to cross-examine the experts on special problems that relate to the individual plaintiffs would still be lost. The greatest disadvantage of this method is that it would place unnecessary burdens on each of the transferor judges, each of whom would have to struggle with identical legal and factual issues, and it would thus fail to reach the level of judicial efficiency and economy that MDL procedures were designed to achieve.

3. Coordinate discovery and other pretrial work, consolidate the actions for trial of the common issues of fact and law, and then remand to the transferor districts for separate trials of the individual issues such as specific causation and damages.

a. Advantages: A single trial of common issues has obvious benefits in economy and efficiency. Spreading to other courts the workload of trying individual cases at least makes a judicial solution to this litigation possible in terms of time and workloads.

b. Disadvantages: The consolidation technique addresses only the pending actions, that is, it involves those situations where the plaintiff has seized the initiative and brought suit. However, there are many people with valid claims who for one reason or another have not asserted them by bringing suit and who would therefore not recover for damages inflicted, including damages of which they might not yet even be aware.

4. Certify the litigation as a class action, using all the flexibility of that device, including subclasses, to determine common issues before this court and ultimately determine the individual issues either under the direct supervision of this court or after remand to other courts.

a. Advantages: Class action treatment would give this court full control over the entire litigation. Any determinations reached in the class action would bind all defendants as well as all members of the class except those who chose to opt out, and as to them, their suits could be consolidated for joint trial with the class action. By use of subclasses to be certified as the need later arises, additional trials on issues common to identified subclasses may be conducted either here in the Eastern District of New York, or by the transferor courts after remand, or by a combination of both. This method provides the greatest flexibility and the greatest opportunity for judicial efficiency and economy of time and money.

b. Disadvantages: The disadvantages with class action treatment lie largely in technical and procedural problems that have arisen with the class action device in other contexts. Such problems have proved particularly troublesome in the context of mass tort cases. Having considered carefully the nature of those technical problems, this court is satisfied that they can be overcome by following the case management plan described in this section and the steps described under the section entitled "Class Action".

After considering the submissions and arguments of the parties and after weighing all of the foregoing and many other considerations, the court has developed the following plan for management of the Agent Orange litigation assigned to it under MDL No. 381:

1. Class action. The Agent Orange litigation will be certified as a class action under F.R.C.P. 23(b)(3). (See discussion below entitled "Class Action").

2. Statutes of limitations. The court will take up immediately the problems of statutes of limitations. (See discussion below entitled "Statutes of Limitations").

3. Separate trials of some issues. Whenever common issues are presented, a common trial should be had, if practicable. These trials will be held as promptly as possible in the Eastern District of New York, preserving at all times the parties' right to a jury trial when properly demanded. Plaintiffs have moved for so-called "serial" trials, describing in some detail the issues they would like tried and the order in which they should be tried. Except insofar as plaintiffs' plan is adopted by this decision, that motion is denied. As appears in the discussion below entitled "Summary Judgment" there is an issue that can be separately tried at the threshold of this action: whether the defendants are protected by the "government contract defense". The court intends to try that issue separately. After that, if needed, there may be an additional trial addressing liability questions such as negligence, product liability, and general causation, where a jury will be able to hear all of the evidence relating to the development, manufacture and use of

Agent Orange, and the scientific and medical evidence relating to its potential effects, and report its findings in carefully drafted special verdicts. Those special verdicts can then serve as a framework for later disposition of the issues of individual causation (whether a particular veteran was exposed, to what degree, and with what results) and damages. The court has not yet determined whether the individual issues can be best resolved under the direct supervision of this court or by remand of subclass actions to transferor courts for processing in ways appropriate to the circumstances of the subclasses. Those determinations necessarily must be made at a later date.

4. Discovery. Until now the court has stayed all discovery except that conducted voluntarily. That stay will now be lifted, and mandatory discovery shall now proceed according to the plan described in the section below entitled "Discovery".

5. Miscellaneous.

■ a. Plaintiffs' motion to amend the complaint by adding the United States government and many of its officials on a theory of constitutional tort is denied. The issues sought to be raised by plaintiffs through the amendment are sufficiently different from those presented by this already complex litigation to require that the constitutional claims against government officials and the government itself be pursued by one or more separate actions, if plaintiffs are so inclined. Denial of the motion, therefore, is without prejudice to whatever rights plaintiffs may have to assert those claims in separate proceedings.

b. Jurisdiction and pleadings. There is some confusion as to the precise state of the pleadings in the many pending actions. The court has not yet determined what precise disposition will be made of the various individual actions in light of the class certification. Unless a party files in a particular action a notice disclaiming the benefit afforded by the following, all of the pleadings in all cases now or hereafter filed under MDL 381 are deemed amended as follows:

1. The complaints are deemed amended to allege the residence of the plaintiffs, and to name and allege the residence of each of the defendants whose citizenship is diverse from that of the plaintiff. All plaintiffs are deemed to have joined all diverse defendants as defendants in their individual actions.

2. All defendants are deemed to have answered all complaints brought against them, with general denials plus all affirmative defenses thus far raised in filed answers to any of the Agent Orange MDL cases. All answers are deemed to include crossclaims for indemnification and contribution against all other defendants. All crossclaims are deemed denied.

The court recognizes that (1) any case management plan may have to be changed in order to adapt to new or unforeseen circumstances; (2) not every facet of the plan adopted for this Agent Orange litigation will please everyone; and (3) this litigation presents problems of a type and magnitude that differ substantially from the established precedents so that it cannot proceed in one of the well established patterns for lawsuits. Under these circumstances, it is the court's obligation to control the case, seeking always the goal of a "just, speedy and inexpensive determination" of the litigation.

Lawsuits, of course, must be guided and decided by the principles of substantive law and rules of procedure established by Congress, by the legislatures of the various states, and by the principles of common law where applicable. The rules of procedure, however, are not intended to require rigid adherence to preordained steps; instead, they are standards and requirements to be used, molded and adapted so as to achieve just, speedy and inexpensive determination of lawsuits. Although "speedy" and "inexpensive" are relative terms having almost ironic implications in the context of the Agent Orange litigation, this court is satisfied that the plan described will, with the cooperation of counsel, attain at least a "just" determination of these lawsuits, and will do so at less cost and in less time than would a more conventional approach.

## IV. CLASS ACTION

 Contending that many of the issues here presented are best determined by class action to avoid duplicitous litigation by the individual members of the proposed class, plaintiffs have moved for a conditional order pursuant to F.R.C.P. 23 permitting the suit to proceed as a class action on behalf of all persons exposed to Agent Orange and various members of their families. Under Rule 23(c)(1) and 23(d), the order would be subject to such later modification as the court may find appropriate and necessary in light of future developments in the case.

 Before a class action may be maintained under Rule 23, the action must meet the prerequisites of Rule 23(a) and one set of the alternate requirements of Rule 23(b). Defendants oppose class treatment, but continue to advance some outrageous arguments in the name of advocacy; detracting from whatever valid arguments they might otherwise have, they argue that plaintiffs fail to satisfy even one of the elements necessary under Rule 23. Plaintiffs, equally undiscriminating in their advocacy, argue that *every* element of *every* alternative of Rule 23 is met here.

The court has carefully read and considered the voluminous submissions of the parties and has heard and considered oral arguments of counsel on this issue. After due consideration, the court determines that plaintiffs have demonstrated that a class action is appropriate under Rule 23(b)(3). Accordingly, plaintiffs' motion for conditional class action certification is granted as herein provided. Certain specific findings are required.

### A. THE PREREQUISITES OF RULE 23(a)

#### 1. Numerosity

The members of the plaintiff class here are so numerous that joinder of all members of the class in the same action is impracticable. Rule 23(a)(1). Indeed, if the only members of the class were the plaintiffs in the 167 actions now pending in this court, "numerosity" would be satisfied.

#### 2. Commonality

Rule 23(a)(2) states that a class action may only be maintained if "there are questions of law or fact common to the class." Here, the action raises numerous questions of law *and* fact common to the class. Whatever may be the individual questions relating to the manner and extent of each veteran's exposure to Agent Orange, and relating to the particular effects of Agent Orange on the veteran when considered along with his/her medical history, circumstances, lifestyle and other unique conditions, all of these claims share a common ground when proceeding through the many factual and legal issues relating to the government contract defense, negligence by the defendants, whether Agent Orange was a "defective product", and the many questions embodied in the concept of "general causation". In part, the requirement of commonality is one aimed at determining whether there is a need for combined treatment and a benefit to be derived therefrom. Here the need is compelling, and the benefits are substantial.

#### 3. Typicality

Rule 23(a)(3) requires that in a class action "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." As already noted, plaintiffs' claims of negligence, products liability and general causation, as well as the defendants' government contract defense are not just "typical" of the entire class, they are identical. In a few areas, such as the rules governing liability and the application of various statutes of limitations, the claims may fall into groups that are "typical", but even there the different groups' claims can be efficiently managed either on a subclass basis or directly by way of separately determining the issues. Although the named plaintiffs for purposes of the class action are yet to be designated, the court is satisfied that out of the extremely large pool available representative plaintiffs can be named who will present claims typical of those of the class. As already indicated, the issues of specific causation and damages will, of course, ultimately re-

quire individual consideration, but until that point in the litigation is reached, a class action appears to be the only practicable means for managing the lawsuit.

### 4. Adequacy

Rule 23(a)(4) provides that a class action may only be maintained if "the representative parties will fairly and adequately protect the interests of the class." Adequacy of representation depends on the qualifications and interests of counsel for the class representatives, the absence of antagonism or conflicting interests, and a sharing of interests between class representatives and absentees. 7 Wright & Miller *Federal Practice and Procedure* §§ 1765–1769 at 615–657. Here, the court will select from among the hundreds of plaintiffs representative persons who have a substantial stake in the litigation, who lack conflicts, antagonisms or reasons to be motivated by factors inconsistent with the motives of absentee class members, and who will fairly and adequately protect the interests of the class. Further the class will be represented by experienced, capable counsel, Yannacone and Associates,[32] who have shown themselves willing to undertake the considerable commitment of time, energy and money necessary for the vigorous prosecution of the claims here asserted.

### 5. Additional Requirements

Courts have implied two additional prerequisites to class action certification that

are not specifically mentioned in Rule 23: (1) there must be an identifiable class, and (2) the class representatives must be members of the class. 7 Wright and Miller *Federal Practice and Procedure* §§ 1760, 1761 at 579–592. Here, the plaintiff class can be readily identified; they are persons who claim injury from exposure to Agent Orange and their spouses, children and parents who claim direct or derivative injury therefrom. The court has intentionally defined the class in broad terms consistent with the demands of this litigation. If we begin with the broadest possible class, the issues common to all members of that class can be resolved. It may later prove advantageous to create subclasses for various purposes, *e.g.*, for resolving statute of limitations claims, for determining liability in "negligence" as opposed to "product liability" states, and finally, perhaps, for preserving the class action format prior to remand to the transferor judges so as to provide them with the greatest possible flexibility in ultimately determining the issues remaining after multidistrict treatment has ended.

### B. THE REQUIREMENTS OF RULE 23(b)

Plaintiffs seek certification of a plaintiff class under Rule 23(b)(1)(A), (b)(1)(B), (b)(2) & (b)(3).[33] For the reasons set forth below,

---

**32.** Yannacone and Associates is a consortium of lawyers who have banded together for purposes of this lawsuit under the leadership of Victor Yannacone, who brought the initial actions and who was designated as lead counsel for the plaintiffs shortly after the cases were transferred to this court by the multidistrict panel. Some of the lawyers in the consortium represent plaintiffs in one or more of the component Agent Orange actions; others apparently have been brought into the group because of special expertise and experience. This case is too complex and too demanding for any single attorney to handle it on behalf of plaintiffs. Yannacone and Associates has already demonstrated that the combined efforts of its twenty or so members will fairly and adequately protect the interests of the class and that together they have the expertise and desire to prosecute this demanding action properly.

**33.** Rule 23(b) provides that an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

however, the court concludes that class certification is appropriate only under Rule 23(b)(3).

### 1. Rule 23(b)(1)

Rule 23(b)(1), the "prejudice" class action provision, authorizes class action treatment if some prejudice would result to any party if members of the class were required to litigate their claims in a series of individual actions, and the resulting prejudice can be obviated by using a class action. The provision is broken down into two separate clauses.

■ Rule 23(b)(1)(A) authorizes a class action when the prosecution of separate actions would create a risk of "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class". This section focuses on the difficulties that class action certification may visit on the party opposing the class action. It is designed to prevent situations in which different courts establish "incompatible standards of conduct" for that party.

Rule 23(b)(1)(A) is *not* meant to apply, however, where the risk of inconsistent results in individual actions is merely the possibility that the defendants will prevail in some cases and not in others, thereby paying damages to some claimants and not others. *McDonnell Douglas Corporation v. United States District Court, Central District of California*, 523 F.2d 1083, 1086 (CA9 1975), *cert. denied sub nom., Flanagan v. McDonnell Douglas Corporation*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). "The risk of paying money [damages] to some and not others is not what the rule-makers intended by the words 'incompatible standards of conduct' ". A. Miller, *An Overview of Federal Class Actions: Past, Present and Future* at 43 [1977]. Since the only effect of inconsistent decisions here would be the payment of damages to some claimants and not others, class certification under Rule 23(b)(1)(A) would be inappropriate.

■ Rule 23(b)(1)(B) authorizes a class action when separate actions would create a risk of "adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interest of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest." This rule emphasizes possible undesirable effects on the class members, rather than on the opposing party, and permits a class action if separate suits might have undesirable effects on the class members. "The paradigm Rule 23(b)(1)(B) case is one in which there are multiple claimants to a limited fund * * * and there is a risk that if litigants are allowed to proceed on an individual basis those who sue first will deplete the fund and leave nothing for the late-comers." A. Miller *An Overview of Federal Class Actions: Past, Present and Future* at 45 (1977). *See also Administrative Committee's Note, Rule 23*, 39 F.R.D. 69, 101 (1966).

■ However large the potential damages may appear here, plaintiffs offer no evidence of the likely insolvency of defendants and apparently do not, in defendant Dow's words, "have the temerity to argue that the aggregate claims of the purported class exceed the total assets of the five named defendants." [34] Defendant Dow's

---

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

34. Since that statement was made the number of named defendants has increased, *see* footnote 2 *supra*, thus rendering class certification under Rule 23(b)(1)(B) even more inappropriate.

memorandum in opposition to class certification at 20. For good measure, Dow adds "[s]uch an argument would be ludicrous on its face." *Id.* As one court has noted, "without more, numerous plaintiffs and a large *ad damnum* clause should [not] guarantee (b)(1)(B) certification." *Payton et al. v. Abbott Labs et al.*, 83 F.R.D. 383, 389 (D.Mass.1979). Thus, certification under Rule 23(b)(1)(B) is not appropriate.

### 2. Rule 23(b)(2)

 Rule 23(b)(2) authorizes class action treatment where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." This subdivision "does not extend to cases in which the appropriate final relief relates exclusively or predominately to money damages", *Advisory Committee's Note, Rule 23*, 39 F.R.D. 69, 102 (1966); rather, it applies when injunctive relief or declaratory relief on which injunctive relief could be based is proper. *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 564 (CA2 1968), *vacated on other grounds*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Here, the relief requested relates predominately to money damages so the class may not be certified under Rule 23(b)(2).[35]

### 3. Rule 23(b)(3)

Rule 23(b)(3) authorizes a class action when the court finds "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to all other available methods for the fair and efficient adjudication of the controversy." The rule lists four matters pertinent to a consideration of these issues: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation

concerning the controversy already commenced by or against members of the class; (C) the desirability or un-desirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

Considering the circumstances of this action, and bearing in mind the manner in which the class action will proceed, the court determines that the interest of class members in individually controlling the prosecution of separate actions is minimal, especially at this early stage of the litigation when the issues under consideration concern the relationship between the defendants and the government, issues that impact equally on every plaintiff's claim. Rule 23(b)(3)(A). Later stages of this litigation, especially those concerned with individual causation and damages, may require reconsideration of this element and possibly decertification, but at this stage, individual class members have almost no interest in individually controlling the prosecution of separate actions. Indeed, the problems inherent in every one of the individual actions are so great that it is doubtful if a single plaintiff represented by a single attorney pursuing an individual action could ever succeed.

With respect to the extent and nature of currently pending litigation, almost all the Agent Orange litigation currently pending is before this court under the multidistrict litigation procedures. All those cases are advancing simultaneously, and certification of a class action will serve the goals of judicial economy and reduce the possibility of multiple lawsuits. Rule 23(b)(3)(B). In addition, it will significantly expedite final resolution of this controversy.

With respect to the desirability of concentrating the litigation of the claims in this forum, the actions have already been concentrated before this court through the use

---

**35.** The court is aware that plaintiffs have requested that a trust be established to apply defendants' future profits for the benefit of the plaintiff class. While this possible relief has not been excluded from the case, it does not serve as a sufficient basis for class certification pursuant to F.R.C.P. 23(b)(2).

of MDL procedures. Allowing it to proceed as a class action will minimize the hazards of duplicate efforts and inconsistent results. Moreover, given the location of present counsel and the widely varying citizenships of the interested parties, this court is as appropriate a place to settle the controversy as any. Rule 23(b)(3)(C).

With respect to the difficulties likely to be encountered in the management of a class action, the court has carefully and humbly considered the management problems presented by an action of this magnitude and complexity, and concluded that great as they are, the difficulties likely to be encountered by managing these actions as a class action are significantly outweighed by the truly overwhelming problems that would attend any other management device chosen. While the burdens on this court might be lessened by denying class certification, those imposed collectively on the transferor courts after remand of the multidistrict cases would be increased many times.

Having carefully considered the above factors and all other circumstances of this action, the court is satisfied that at this time the questions of law and fact common to the members of the class predominate over questions of law or fact affecting only individual members, and that a class action is superior to any other available method for the fair and efficient adjudication of the controversy.[36]

Because over a year ago this court requested plaintiffs not to file actions pending decision on the class action motion, because the facts and issues in all of the pending and future cases are to a great degree identical, or at least parallel, and because this action presents a variety of questions in relatively untested areas of the law, this court sees the objectives of F.R. C.P. Rule 1 and Rule 23, as well as the interests of justice, best served by determining here, and for all parties, as many legal and factual issues as may properly be

decided. To achieve those ends the court will certify this to be a class action under F.R.C.P. 23(b). Formal certification will be by separate order to be processed under the court's instructions.

## C. NOTICE

Rule 23(c)(2) states that "In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

Two problems with notice must be considered: how the notice shall be given and what the notice shall say. In the order to be prepared and signed which will officially certify the class, the court will direct both the manner and content of notice.

As to the manner of notice, both the rule and the court decisions display a preference for individual notice whenever possible, and ordinarily the financial burden of giving notice falls on the plaintiffs. Individual notice to all members of the broad class to be certified may be impossible. The rule requires, however, only "the best notice practicable under the circumstances". Counsel are invited to submit suggestions in writing as to how "the best notice practicable" may be given to the over two million Vietnam veterans and their families who are included in the class by January 23, 1981. Certain possibilities have already been suggested, including having the Veterans Administration mail copies of the notice to all Vietnam veterans on their mailing list, and soliciting the aid of veterans' organizations around the country to circularize their memberships.

It may be that other persons or organizations are willing to assist in resolving the notice problem. The news media in particular might volunteer space or time to assure "the best notice practicable" to veterans and their families. Still other means by which the notice requirement can be fairly

---

**36.** There being no need to certify subclasses of plaintiffs at this time, the court will postpone consideration of the subclass issues to a later time when the most efficient and logical course to follow will be clearer.

and reasonably fulfilled may exist. After considering all suggestions received by January 23, 1981, the court will determine how notice shall be given.

As to the form of notice, Yannacone and Associates is directed to serve and file by January 7, 1981 a proposed form of notice which shall include at least the following information in as simple and direct a form as possible:

1. It shall state briefly the nature of plaintiffs' suit, their causes of action and their claims for relief.

2. It shall set out the definition of the plaintiff class and in general terms the issues that will have to be determined.

3. It shall notify the recipient that at his/her request the court will exclude him/her from the class so long as the request is received by a date specified in the notice that counsel and the court will set. Rule 23(c)(2)(A).

4. It shall make clear that any findings, whether favorable or not, will be binding on all class members who do not request exclusion. Rule 23(c)(2)(B).

5. It shall explain that any class member who does not request exclusion may enter an appearance through his/her counsel. Rule 23(c)(2)(C).

Counsel for defendants shall meet on or before January 16, 1981 to discuss and, if possible, agree upon suggested modifications to plaintiffs' proposed form of notice and serve and file their suggested changes, if any, with the court by January 23, 1981. To the extent that agreement among defense counsel is not possible, they may make separate submissions.

By January 16, 1981 Yannacone and Associates shall submit to the court a list of no more than 12 persons whom they propose as representative plaintiffs for the class action. Defendants may, if they choose, submit any comments, objections or suggestions with respect to the proposed representative plaintiffs by January 23, 1981.

The court will then determine who will be the named plaintiffs in the class action, and plaintiffs' attorneys will be directed by further order of this court to prepare an appropriate class action order and class action complaint.

## V. SUMMARY JUDGMENT

On this motion, defendants argue that they are entitled to summary judgment against plaintiffs because, acting under compulsion of federal law, they were forced to manufacture Agent Orange under circumstances carefully controlled by the government. Cases analyzing similar arguments have utilized various terminology to describe this defense, the most common being that defendants seek to "share in the government's immunity", *Green v. ICI America, Inc.*, 362 F.Supp. 1263, 1264 (E.D. Tenn.1973), or that defendants assert a "government contract defense". *See Merritt, Chapman & Scott Corporation v. Guy F. Atkinson Company*, 295 F.2d 14, 16 (CA9 1961).

## A. THE GOVERNMENT CONTRACT DEFENSE

Whatever its label, the government contract defense [37] in this case essentially seeks to avoid manufacturer liability on the ground that the circumstances surrounding Agent Orange's manufacture and use were controlled and dictated by the United States government acting in a capacity in which the government is protected from liability by sovereign immunity and the *Feres/Stencel* doctrine.

In the seminal case of *Yearsley et al. v. W. A. Ross Construction Company*, 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), the Supreme Court recognized the possibility that contractors who properly perform their work pursuant to contracts with the United States government might avoid liability for injuries resulting from the work done. Plaintiff, who sought to recover damages for erosion of his waterfront property

---

**37.** For purposes of convenience this defense will be called the "government contract defense" for the remainder of this decision.

caused by defendant's construction of dikes in the Missouri River, conceded that defendant had acted "pursuant to a contract with the United States Government, under the direction of the Secretary of War and the supervision of the Chief of Engineers of the United States, for the purpose of improving navigation of the Missouri River." 309 U.S. at 19, 60 S.Ct. at 414. The Court held that the contractor was not liable, because the work done had been properly authorized and properly performed. Summarizing the relevant principles, the Court stated

> [I]t is clear that if [the] authority to carry out the project was validly conferred * * there is no liability on the part of the contractor for executing [the government's] will. (citations omitted). Where an agent or officer of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be either that he exceeded his authority or that it was not validly conferred. 309 U.S. at 20–21, 60 S.Ct. at 414.

Following these principles, subsequent cases have stated the rule in various ways:

> To the extent that the work performed by [the contractor] was done under its contract with the [government], and in conformity with the terms of said contract, no liability can be imposed upon it for any damages claimed to have been suffered by [plaintiffs]. *Myers v. United States*, 323 F.2d 580, 583 (CA9 1963); The [contract work] was pursuant to validly conferred authority under a contract [with the government]. The question of foreseeability of harm and the possible need to protect against it arose when the Government framed its terms. There is no charge that what the contractor did was not what it was required to do. * *

[The question of taking measures to safeguard against harm caused by the plans] was a decision which rested with the Government. The Government did not provide for such additional precautions in the plans, and the [contractor] is not to be held liable for this omission. *Dolphin Gardens, Inc. v. United States*, 243 F.Supp. 824, 827 (D.Conn.1965);

Where the act, or failure to act, which causes an injury is one which the [government] contractor was employed to do, and the injury results not from the negligent manner of doing the work, but from the performance thereof or failure to perform it at all, the contractor is entitled to share the immunity from liability which the public enjoys, but * * * the contractor is not entitled to the immunity of the public body from liability where the injury arises from the tortious manner of performing the work." *Green v. ICI America, Inc.*, 362 F.Supp. 1263, 1265 (E.D.Tenn.1973) *quoting* 9 A.L.R.3d 382, 385 (1966).[38]

▮ Behind this rule lie considerations of fairness and public policy. First, tort liability principles properly seek to impose liability on the wrongdoer whose act or omission caused the injury, not on the otherwise innocent contractor whose only role in causing the injury was the proper performance of a plan supplied by the government. The imposition of tort liability on a wrongdoer can have a strong prophylactic effect; tortfeasors held liable for damages that flow from their wrongdoing have a strong incentive to prevent the occurrence of future harm. *See* W. Prosser, *Law of Torts* § 4 at 23 (4th ed. 1971). Before any societal benefit can be derived from the deterrent effects of tort liability, however, the party in a position to correct the tor-

---

**38.** *See also Merritt, Chapman & Scott Corp. v. Guy F. Atkinson Company*, 295 F.2d 14, 16 (CA9 1961) ("where the plans and specifications were drawn and adopted *prior* to the contract * * * the contractor is entitled to follow such plans and specifications, exercising due and proper care and skill, and require parties damaged to look to the government, which has required such a contract, for relief.") (emphasis in original); *O'Grady v. City of Montpelier*, 474 F.Supp. 186, 188 (D.Vt.1979), *rev'd on other grounds*, 573 F.2d 747 (CA2 1978) (no action lies against contractor who entered contract with city, performed work in accordance with detailed specifications provided by the city, did not act outside scope of authority, and performed work in non-negligent manner).

tious act or omission must be held accountable for the damages caused and thus motivated to prevent future torts.

■ Second, the policy considerations that lend continuing vitality to governmental immunity argue for "extension" of that freedom from liability to some government contractors. As one court put it:

> To impose liability on the contractor [for the government's planning failures] would render the Government immunity * * * meaningless, for if the contractor was held liable, contract prices to the Government would be increased to cover the contractor's risk of loss from possible harmful effects of complying with decisions of [governmental] officers authorized to make policy judgments. *Dolphin Gardens, Inc. v. United States,* 243 F.Supp. 824, 827 (D.Conn.1965).[39]

These considerations take on increased significance when the government contracts with manufacturers of military ordnance in war time. Where, as here, manufacturers claim to have been compelled by federal law to produce a weapon of war without ability to negotiate specifications, contract price or terms, the potential for unfairly imposing liability becomes great. Without the government contract defense a manufacturer capable of producing military goods for government use would face the untenable position of choosing between severe penalties for failing to supply products necessary to conduct a war, and producing what the government requires but at a contract price that makes no provision for the need to insure against potential liability for design flaws in the government's plans.

A recent New York State court decision, *Casabianca v. Casabianca,* 104 Misc.2d 348, 428 N.Y.S.2d 400 (S.Ct. Bronx County 1980), recognized the problem of a manufacturer who provides products necessary to conduct a war under contract with the government. In *Casabianca* the court held that, as a matter of public policy, a manufacturer who supplies equipment to the United States Army in a time of war pursuant to government specifications may not be held liable for any inadequacy in the plans because

> A supplier to the military in time of war has a right to rely on such specifications and is not obligated to withhold from the United States armed forces material believed by the latter to be necessary because the manufacturer considers the design to be imprudent or even dangerous. His conformance, under such circumstances, to the specifications provided to him should be, and is, a complete defense to any action based on design, whether faulty or not. *Casabianca v. Casabianca,* 104 Misc.2d 348, 428 N.Y.S.2d 400, 401–402 (S.Ct. Bronx County 1980) (Stecher, J.).

■ Although some courts ignore or deny its existence,[40] the Supreme Court's recognition of the defense in *Yearsley v. W. A. Ross Construction Company* and the application of the defense in numerous other decisions certifies its continuing viability.[41]

## B. THE POSITIONS OF THE PARTIES

As defendants would apply the government contract defense here, plaintiffs' claims against the corporate defendants could not be actionable because the United States Government (1) invented Agent Orange, (2) experimented with herbicides for

---

39. This may even understate the effect of imposing liability on government contractors so situated, because those contractors would presumably seek to insure against possible liability for the government's inadequacies and insurance companies do not spread the risk of loss without some financial benefit to themselves. If taken to the extreme, the government might ultimately find it less expensive to waive immunity under the circumstances, accept liability for injuries caused by its planning failures, and thereby avoid the expensive middleman.

40. See *Foster v. Day & Zimmerman, Inc.,* 502 F.2d 867, 873–74 (CA8 1974); *Whitaker v. Harvell-Kilgore Corp.,* 418 F.2d 1010, 1013–15 (CA5 1969).

41. See e. g., *A. J. Myers v. United States,* 323 F.2d 580, 583 (CA9 1963); *Merritt, Chapman & Scott Corp. v. Guy F. Atkinson Company,* 295 F.2d 14, 16 (CA9 1961).

military use for over 20 years; (3) knew dioxin would be a byproduct of the manufacture of 2,4,5–T, an ingredient in Agent Orange; (4) knew the toxicity of dioxin as early as 1962; (5) compelled the defendants to manufacture Agent Orange using the mandatory provisions of the Defense Production Act, 50 U.S.C.App. § 2061 *et seq.*, and various economic and "informal" pressures to coerce defendants; (6) refused to allow defendants to produce phenoxy herbicides for their civilian markets; (7) unilaterally determined the terms and specifications of the contracts under which the defendants manufactured Agent Orange, including complete control over the chemical composition, volume, weight, purity, acidity, appearance, quality, inspection, testing procedures, packaging, marking and method of shipment used; (8) visited defendants' plants regularly to conduct inspections and tests to ensure the defendants' compliance with the contract terms; (9) assured the availability to defendants of the raw materials needed to produce Agent Orange on a high priority basis; (10) unilaterally determined the nature and extent of the use in southeast Asia of the Agent Orange produced, with concentrations of component herbicides far in excess of any commercially manufactured product; and (11) exercised exclusive control over the use of Agent Orange in southeast Asia.

Defendants argue (1) that they merely manufactured and supplied Agent Orange to the government pursuant to validly authorized contracts, (2) that Agent Orange was not manufactured before and has not been manufactured since; (3) that they completed their compelled manufacture of Agent Orange in strict compliance with the specifications supplied by the government, specifications that contained no obvious or "glaring" defects that would have alerted the defendants of any impending danger in following them; and (4) that they manufactured Agent Orange without any negligence on their part.

In short, the defendants claim to have served their country's military needs without any shortcomings in their performance. They contend that but for the government's decision to use Agent Orange in southeast Asia the defendants would not have manufactured Agent Orange and the harm claimed to have been caused by the herbicide would never have occurred. Defendants further note that they were in no position to question the government's military judgment to use the herbicide as a tactical weapon during the Vietnam war, and had no choice under federal law but to comply with the government's order to produce Agent Orange.

Thus, defendants argue that they were merely agents of the government acting under the compulsion of federal law in patriotic furtherance of the Vietnam war effort. They claim to have produced an effective product that met, in every respect, the government's detailed specifications and expectations. Defendants argue that well established legal principles, sound social policy, and general principles of fairness dictate that they not be held liable for injuries resulting solely from their strict compliance with government contracts for war related products that performed exactly as expected in their military uses.

Plaintiffs argue (1) that defendants should not be permitted to "hide" behind government specifications to avoid liability, and (2) that summary judgment is inappropriate because the defendants "bald assertion that the [government] specifications were, in fact, complied with" cannot be accepted by the court as true without a trial to determine whether defendants' allegations with respect to the government contract defense are factually correct.

## C. SUMMARY JUDGMENT DENIED

 The standards for consideration of a motion for summary judgment pursuant to F.R.C.P. 56 are well established and need not be repeated here except to note that on a motion for summary judgment the court "cannot try issues of fact; it can only determine whether there are issues to be tried", *American Manufacturers Mutual Insurance Company v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (CA2 1967), *cert. denied*, 404 U.S. 1063,

92 S.Ct. 737, 30 L.Ed.2d 752 (1972) and the court "must resolve any doubts in favor of the party opposing the summary judgment motion". *SEC v. Research Automation Corp.*, 585 F.2d 31 (CA2 1978).

Having considered all the authorities cited and the arguments of counsel, the court is satisfied that a government contract defense exists and has possible application to the facts at bar. Plaintiffs are correct, however, to the extent that they argue the presence of fact issues which preclude summary judgment since any application of the government contract defense in this context will require that defendants prove that their relationship with the government and performance under the government contract was essentially as they describe it. In short, whatever the minimum showing necessary to support a finding for defendants on the government contract defense may be, allegations with respect to their contract performance and relationship with the government present issues of fact requiring trial.

Resolution of the fact issues by separate trial will determine whether defendants have a complete defense to the claims asserted against them. This is the reason the court has chosen the government contract defense for the Phase I trial as discussed in section III above. The elements of the defense will be uniquely adapted to consideration and adjudication, separate and apart from the issues of liability, causation and damages. As a practical matter, discovery as to these discrete issues will be rather narrow compared to the discovery that some of the other fact issues presented by this action may require.

Although satisfied that the government contract defense exists and has possible application here, however, the court is not satisfied that the parties have sufficiently focused their attention on the precise standards applicable and the specific facts defendants need to prove to make out the defense under the circumstances of this action.[42] Accordingly, the parties are to prepare (1) briefs focusing on this issue, and (2) proposed special verdicts to be presented to the jury in the Phase I trial. Of course, the proposed special verdicts will not be binding at this stage; rather, they are to assist counsel and the court in focusing upon the issues that require discovery and trial in Phase I. These items are to be served and filed by January 23, 1981. The court will hear argument on the standards and elements of the government contract defense as applied to this case and will discuss the proposed special verdicts at the pretrial conference to be held January 30, 1981 at 9:00 a. m.

As noted above, the court believes that early resolution of this potentially dispositive issue will serve the interests of justice and judicial efficiency. Although justice is always served by the efficient management of any action, this is especially true in this case where any other procedure adopted might subject the parties to years of discovery and trial only to have later generations of judges, lawyers, and litigants discover that an early trial of the government contract defense might have preempted the need for almost all of the discovery undertaken and saved thousands of person-hours and millions of dollars associated with those unnecessary efforts. The parties here are entitled to have this action handled as efficiently and expeditiously as possible and, in

---

42. For example, some courts view the government contract defense as coupling the government's sovereign immunity with the contractor's obligation to follow the government's directions, *see Green v. ICI America, Inc.*, 362 F.Supp. 1263, 1265 (E.D.Tenn.1973). It may well be that the sovereign's immunity from suit is not an essential element of the defense. *See Dolphin Gardens, Inc. v. United States*, 243 F.Supp. 824, 827 (D.Conn.1965); *A. J. Myers v. United States*, 323 F.2d 580, 583 (CA9 1963). Similarly, other courts frame the elements of the defense in terms of military necessity. *See Casabianca v. Casabianca*, 104 Misc.2d 348, 428 N.Y.S.2d 400, 401–402 (S.Ct. Bronx County 1980) (Stecher, J.). Whether these elements are essential to the successful assertion of the government contract defense, however, need not be determined because the court has determined that the sovereign is immune under the circumstances here presented, *see discussion* Section II *supra*, and it is beyond dispute that the Agent Orange produced by defendants here was manufactured in time of war.

the court's considered view, the approach here outlined balances the numerous interests in a way that will best serve those goals.

## VI. DISCOVERY

Under the case management plan set forth in section III of this pretrial order, it is appropriate for discovery to proceed now as efficiently and expeditiously as possible on all Phase I issues. Most of the material necessary to support the defendants' government contract defense is in defendants' own control. Plaintiffs have continually urged an early trial, and lead counsel has repeatedly represented to the court that depositions of a limited number of Dow employees are the only discovery necessary before proceeding to trial. Although the government is no longer a party to this action, the Department of Justice has promised the court cooperation with all parties in facilitating full and complete discovery of all material within the government's control.

To date, very little discovery has taken place. By practice and procedure order dated May 18, 1979, this court stayed all discovery proceedings until further court order; by order dated February 5, 1980, this stay was modified to allow the parties to "conduct voluntary discovery by agreement among themselves". In addition to whatever voluntary discovery has taken place, the court on specific motions has permitted the depositions of certain plaintiffs with a "high risk of unavailability for trial" to be taken. *E. g., Hartz v. Dow Chemical Company*, 79 C 2752 (EDNY GCP) (memorandum and order of January 18, 1980).

■ The first wave of Phase I discovery is to commence immediately, and the stay is vacated, but only for this purpose. The first wave of discovery, as defined in § 1.50 of the Manual for Complex Litigation, is designed to disclose all preliminary matters necessary before proceeding to discovery on the merits, specifically:

(1) the names and location of witnesses whose written interrogatories or depositions upon oral interrogatories may be sought on the merits; (2) the existence, location and custodian of documents and other physical evidence, the production of which may be sought on the merits; and (3) information concerning the transactions upon which the claims for relief are based.

The parties are directed to serve and file first wave interrogatories by January 15, 1981. Any objections to these interrogatories shall be served and filed on or before January 23, 1981. Defendants shall confer and submit joint interrogatories and objections. Failure to timely object will operate as a waiver of any and all objections. The objections will be discussed and ruled on at the conference scheduled for January 30, 1981. The court does not anticipate frivolous objections to any interrogatories, but any objections made without a good faith basis will be summarily denied as well as subject their proponent to sanctions. The answers to all first wave interrogatories are to be served and filed by February 13, 1981.

The court has previously received and reviewed several suggestions for orderly discovery advanced by the parties. However, those proposals were made without the benefit of the court's case management plan. Counsel are to submit memoranda outlining their thoughts and proposals for the remainder of Phase I discovery by January 23, 1981. Proposals should focus on the scope and type of material to be discovered, as well as the sequence and timing that discovery should take. Those proposals should have as their goal the expeditious, free and open exchange of information contemplated by the Federal Rules of Civil Procedure and required by this court in all cases before it. At the January 30, 1981 conference the court will hear argument about the various proposals and soon thereafter will establish a comprehensive discovery and trial schedule to govern the remainder of Phase I.

## VII. STATUTES OF LIMITATIONS

■ In light of the Second Circuit's decision that federal question jurisdiction is inappropriate in the context of this action,

*In re Agent Orange*, 2 Cir., 635 F.2d 987 (1980), diversity jurisdiction under 28 U.S.C. § 1332 may provide the sole basis for subject matter jurisdiction. Since federal courts sitting in diversity apply state law on questions involving the statute of limitations, *Guarantee Trust Company of New York v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945), and since this action will ultimately involve the statute of limitations of most, if not all, of the states, counsel shall submit briefs setting forth the applicable law of each state on the subject. Even if the pending petition for rehearing before the Second Circuit en banc is granted and federal question jurisdiction is ultimately determined to be a valid ground for subject matter jurisdiction, this survey would be helpful, even necessary, in determining what the federal common law is or should be. The briefs shall be served and filed by January 30, 1981, and reply briefs, if necessary, shall be served and filed by February 6, 1981.

## VIII. CONCLUSIONS

*Government's Motion to Dismiss:*

The government's motion to dismiss is granted, and the third party complaints against the government deemed to have been made in all actions under MDL 381 are dismissed.

*Case Management Plan:*

The case will be tried in "phases" and in accordance with the procedures and principles outlined above in the section of this order entitled "The Case Management Plan".

*Plaintiffs' Motion for "Serial Trials":*

Plaintiffs' motion for serial trials is denied except insofar as the case management plan adopted by the court incorporates the suggestion to use "phased" trials. The denial of the motion is without prejudice to renewal at some future date when the court may seek additional input as to the future course of this litigation.

*Plaintiffs' Motion to Amend the Complaint:*

Plaintiffs' motion to amend the complaint by adding the United States government and many of its officials on a theory of constitutional tort is denied without prejudice to the commencement of a separate action.

*Class Action:*

Plaintiffs' motion for class action certification is granted to the extent of conditional class action certification pursuant to F.R. C.P. 23(b)(3). In all other respects the motion is denied. In addition:

By January 23, 1981 counsel are to submit their suggestions as to how "the best notice available" may be given to the members of plaintiff class.

By January 7, 1981 counsel for plaintiffs shall serve and file a proposed form of notice. Counsel for defendants shall meet by January 16, 1981 to discuss and, if possible, agree upon suggested modifications to the proposed notice. Defendants' suggested modifications, if any, shall be served and filed by January 23, 1981.

By January 16, 1981 counsel for plaintiffs shall submit a list of no more than 12 persons as proposed class representatives. By January 23, 1981 defendants shall serve and file any suggestions, objections or comments they have with respect to the proposed representative plaintiffs. At the January 30, 1981 conference the court will determine who the named plaintiffs will be.

*Defendants' Motion for Summary Judgment:*

Defendants' motion for summary judgment is denied because the defendants' assertion of the government contract defense presents fact issues requiring trial. In addition:

By January 23, 1981 the parties are to serve and file (1) briefs focusing on the precise standards applicable and the specific facts defendants need to prove in order to successfully establish the government contract defense, and (2) proposed special verdicts to be presented to the jury in the Phase I trial. The court will hear argument on the standards and ele-

ments of the government contract defense as applied to this case and will discuss the proposed special verdicts at the pretrial conference to be held January 30, 1981.

*Discovery:*

The stay of discovery previously imposed is vacated to the extent that the parties are to engage in first wave discovery of Phase I issues. In addition:

The parties are to serve and file first wave interrogatories by January 15, 1981. Any objections to these interrogatories shall be served and filed on or before January 23, 1981. Defendants are to confer and submit joint interrogatories and objections. Failure to file timely objections will operate as a waiver of any and all objections. The objections will be discussed and ruled upon at the January 30, 1981 conference. The answers to all first wave interrogatories are to be served and filed by February 13, 1981.

Counsel are to submit memoranda outlining their thoughts and proposals regarding a comprehensive plan and timetable for Phase I discovery by January 23, 1981. The court will hear argument about the various proposals for Phase I discovery at the January 30, 1981 conference.

*Statutes of Limitations:*

Counsel shall serve and file briefs setting forth the applicable law relating to the statutes of limitations of every state by January 30, 1981. Reply briefs, if necessary, shall be served and filed by February 6, 1981.

*Next Conference:*

The next pretrial conference will be held before the undersigned at the Long Island Courthouse on January 30, 1981 at 9:00 a. m. Any party wishing to propose additions to the agenda should do so by letter to the court received no later than January 27, 1981.

SO ORDERED.