William J. HOPKINS, as administrator of the Estate of Patrick William Hopkins, and William J. Hopkins and Margaretha Hopkins, individually, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 82 CV 1938(ERN).

United States District Court, E.D. New York.

July 29, 1983.

Schoer & Sileo, Forest Hills, N.Y., for plaintiffs by Gary Schoer, Forest Hills, N.Y.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., for defendant by Jo Davis, Asst. U.S. Atty., Brooklyn, N.Y.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Plaintiffs brought this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), for damages for the death of their son, Private Patrick William Hopkins, allegedly-caused by defendant's negligence in diagnosing, treating and supervising him while he was serving in the Armed Forces. Specifically, plaintiffs assert that defendant's negligence caused their son to suffer great emotional distress and mental anguish which eventually culminated in his death by suicide. Plaintiffs further allege

that by virtue of his wrongful death, they were deprived of their son's support and companionship. In response to the complaint, defendant has moved for summary judgment on the ground that *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), deprives this court of subject matter jurisdiction. For the reasons stated below, the court is compelled to agree and, accordingly, judgment dismissing the complaint must be granted.

## I. FACTS

The facts presented by the parties in their memoranda and supporting documents are essentially undisputed. Both parties agree that on or about April 24, 1980, the Hopkins' son was diagnosed by the Army as suffering from a psychological disorder characterized as moderate to acute, paranoid schizophrenia. According to his Army medical records, he exhibited signs of extreme agitation and complained of hearing "voices" which he believed were "trying to make him crazy." Because of his apparent psychosis, the decedent was hospitalized at Fort Lewis, Washington, and pursuant to Army Regulation AR–635–40, his case was referred to a Medical Evaluation Board (MEB) for further investigation.

The MEB, which consisted of a panel of Army physicians, reviewed the decedent's medical history, symptoms and treatment, and, after meeting with the decedent, issued a diagnostic report on June 17, 1980 concurring in the previous explanation of decedent's disorder. Based upon its evaluation of decedent's symptomatology, the MEB concluded in its report that while he was "mentally competent to handle his own affairs," his disorder rendered him medically unqualified for retention in active military status. Accordingly, the MEB recommended temporary separation from the Service. The MEB further advised that the decedent should continue medication for an indefinite period and that he seek "outpatient follow-up psychiatric care at the VA Hospital nearest his home."

Pursuant to regulation AR–635–40, decedent's case was then referred to a Physical Evaluation Board (PEB) to determine if he was, in fact, unfit for active military duty, and to determine whether his disorder was attributable to his service in the Army. The PEB convened on June 24, 1980 and it too concluded that decedent was suffering from chronic paranoid schizophrenia, which they attributed to his military service. In its written report issued on June 28, 1980, the PEB also agreed with the MEB that decedent was unfit for further military service and suggested that he be placed on temporary disability retirement leave (TDRL). Waiving his right to appeal to a formal PEB, decedent acquiesced in the PEB findings.

At this point, and in accordance with regulation AR–635–40, decedent's medical file was forwarded to the United States Army Disability Agency for review, and then to the Commanding General of the Military Personnel Center (MILPERCEN) for final action. Prior to the conclusion of this review process, however, the decedent sought and was granted permanent change of station orders allowing him to return home on leave while he awaited final orders from MILPERCEN. On August 8, 1980, five days after decedent's death, MILPERCEN approved the recommendations of the PEB and issued orders relieving decedent of his active duty assignment as of August 15, 1980, and placing him on TDRL beginning August 16, 1980. After exhausting their administrative remedies, plaintiffs commenced this action.

The gravamen of plaintiffs' complaint is that the Army acted negligently when it diagnosed the decedent as a chronic paranoid schizophrenic and when it released him from hospitalization in July of 1980 without providing further supervision or care. Taking their allegations as true for purposes of defendant's motion to dismiss, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Rodriguez v. Board of Education,* 620 F.2d 362, 365 (2d Cir.1980), the crucial question is whether the Supreme Court's decision in *Feres v. United States, supra,* bars this action because the injuries complained of "[arose]

out of or [were] in the course of an activity incident to [the decedent's military] service." *Id.* 340 U.S. at 146, 71 S.Ct. at 159. To answer this question, an understanding of *Feres* and its progeny is necessary.

## II. THE *FERES* DOCTRINE

Stated briefly, the *Feres* doctrine provides the government with a broad, much criticized, but well settled exception to its liability under the Federal Tort Claims Act. Standing as one of the last vestiges of sovereign immunity, the doctrine prevents military personnel from suing the government for damages incurred in a service-related incident. The effect of the doctrine is not only to preclude suits brought by the serviceman, but also to prevent derivative actions commenced by the serviceman's family members. *Monaco v. United States,* 661 F.2d 129, 134 (9th Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 762, 781 (E.D.N.Y.1980); *Harrison v. United States,* 479 F.Supp. 529, 530–31 (D.Conn. 1979), *aff'd mem.,* 622 F.2d 573 (2d Cir.), *cert. denied,* 449 U.S. 828, 101 S.Ct. 93, 66 L.Ed.2d 32 (1980). While the application of the *Feres* doctrine to actions brought to remedy injuries occurring during actual combat or military maneuvers presents little difficulty, *e.g., Rotko v. Abrams,* 338 F.Supp. 46, 47 (D.Conn.1971), the question of when an injury is or is not service-related becomes more complex as the military nature of the injury-causing activity becomes more tenuous. *See generally,* Comment, *The Effect of the* Feres *Doctrine on Tort Actions Against the United States by Family Members of Servicemen,* 50 Fordham L.Rev. 1241 (1982). In a trilogy of cases, the Supreme Court has sought to provide some guidance on this issue.

In the first of these cases, *United States v. Brooks,* 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949), the Supreme Court allowed two servicemen to recover for injuries suffered when they were struck by a civilian-operated Army vehicle. In reaching this result, the Court focused on the relationship of the servicemen's military status at the time the negligent act took place to the actual cause of their injuries. Noting that both men were on furlough and off the military base when the accident took place, the Court concluded that "the injuries [were] not caused by their service except in the sense that all human events depend upon what has already transpired." *Id.* at 52, 69 S.Ct. at 920. Recognizing the potential "dire consequences" of its decision, however, the Court expressly reserved the question whether an action would lie under the FICA for injuries sustained incident to active military service. *Id.* at 51–52, 69 S.Ct. at 919–920.

A year after *Brooks,* the Court in *Feres v. United States, supra,* faced this "wholly different case." Before the Court were three separate actions. The first involved a wrongful death action brought by the wife of a soldier who had perished in an Army barracks fire. The other two actions involved claims of medical malpractice brought by and on behalf of two servicemen who allegedly had been injured by the negligence of Army medical personnel. Holding that all three claims were barred by sovereign immunity, the Court distinguished its decision in *Brooks* on the ground that "[t]he injury to Brooks did not arise out of or in the course of military duty.... [He] was on furlough ... [and] under compulsion of no orders or duty and on no military mission." *Id.* 340 U.S. at 146, 71 S.Ct. at 159. The Court reasoned that where the injury "arises out of or is in the course of an activity incident to service," the distinctively federal character of the relationship between the government and members of its armed forces precluded application of the State law remedies available under the Federal Tort Claims Act. *Id.* at 142–43, 71 S.Ct. at 157–58. Since Congress had not seen fit to provide a federal tort remedy, the Court concluded that the serviceman's sole remedy for such service-related injuries was limited to a recovery of veteran benefits.

In *United States v. Brown,* 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954), the Court

**494**

added a further gloss to the issue. In *Brown,* the Court allowed a discharged veteran to bring a medical malpractice action against the Veterans Administration for the alleged negligent treatment he received *after* his discharge from the military. In reaching this result, the Court reasoned that the major but unarticulated premise behind the *Feres* decision was the belief that suits based upon service-related injuries could adversely affect military discipline. The Court stated:

> The peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty, led the Court to read that Act as excluding claims of that character.

*Id.* at 112, 75 S.Ct. at 143. Because Brown's suit sought compensation for conduct occurring while he enjoyed a civilian status, the action could not be construed as an affront to military discipline, and accordingly the Court permitted the action. *Id.* at 112–13, 75 S.Ct. at 143–44.

Using these decisions as guideposts, the lower federal courts have attempted to draw a fine but meaningful line between the compensable and non-compensable tortious act. The majority of the decisions have focused on the rationale espoused by the Supreme Court in *Brooks, supra.* As explained by the District of Columbia Circuit:

> [T]he protection of military discipline ... serves largely if not exclusively as the predicate for the *Feres* doctrine. Although the Court has woven a tangled web in its discussion of the "distinctly federal" notion and of the alternative compensation system, it has not wavered on the importance of maintaining discipline within the armed forces. The Court has found it unseemly to have military personnel, injured incident to their service, asserting claims that question the propriety of decisions or conduct by fellow members of the military. Only this

factor can truly explain the *Feres* doctrine and the crucial line that it draws on the basis of whether an injury arose "incident to service."

*Hunt v. United States,* 636 F.2d 580, 599 (D.C.Cir.1980) (citations omitted); *accord Monaco v. United States, supra,* 661 F.2d at 132. Using this rationale, the diverse, factually-oriented decisions under the *Feres* doctrine resolve themselves into more understandable legal principles. Thus, for the most part, courts have consistently held that injuries resulting from on-base accidents are non-compensable for the simple reason that personnel on a military base are always subject to military discipline and control. *E.g., Camassar v. United States,* 531 F.2d 1149 (2d Cir.1976); *Chambers v. United States,* 357 F.2d 224 (8th Cir.1966); *Keisel v. Buckeye Donkey Ball, Inc.,* 311 F.Supp. 370 (E.D.Va.1970). Similarly, injuries sustained while the claimant was on active duty status *and* subject to military orders, have generally been barred by the *Feres* doctrine. *E.g., Miller v. United States,* 643 F.2d 481 (8th Cir.1980); *Woodside v. United States,* 606 F.2d 134 (6th Cir.1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980); *Uptegrove v. United States,* 600 F.2d 1248 (9th Cir.1979), *cert. denied,* 444 U.S. 1044, 100 S.Ct. 732, 62 L.Ed.2d 730 (1980).

The same rule has been applied to claims of medical malpractice brought by servicemen on active duty, since they too are subject to the orders of the military medical staff. *E.g., Johnson v. United States,* 631 F.2d 34 (5th Cir.1980), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981); *Veillette v. United States,* 615 F.2d 505 (9th Cir.1980). This is true even if the injury manifests itself only after the serviceman has reentered civilian life. *E.g., Monaco v. United States, supra,* 661 F.2d at 133; *In re "Agent Orange" Product Liability Litigation, supra,* 506 F.Supp. at 781. On the other hand, if the injury results from medical treatment provided to a veteran, *United States v. Brooks, supra,* or to a serviceman on permanent disability retirement leave, *Crumpler v.*

*United States,* 495 F.Supp. 266 (S.D.N.Y. 1980), the claim will be allowed.

## III. DISCUSSION

 Applying the foregoing principles to this case, it is apparent that the complaint must be dismissed insofar as it seeks to challenge the Army's treatment of decedent during his hospitalization at Fort Lewis, and its subsequent decision to release him from that hospital. Not only were these decisions of military origin insulated by the *Feres* policy of precluding litigation premised on such internal military matters, *see Brooks, supra;* but, in addition, these acts or omissions all occurred while decedent was in an active duty status on a military base, and subject to military control. The *Feres* case itself made clear that "the medical care given servicemen in Army hospitals is so entwined with the military relationship that a serviceman cannot bring an action under the FTCA for the negligent provision thereof." *Johnson v. United States, supra,* 631 F.2d at 36 (citing cases). Nor does it matter that the injuries complained of manifested themselves only after the decedent was released from the hospital, since under the *Feres* doctrine it is not the time of injury but the time of the negligent act which is controlling. *Monaco v. United States,* 661 F.2d at 133; *In re "Agent Orange" Products Liability Litigation, supra,* 506 F.Supp. at 781.

Plaintiffs contend, however, that the *Feres* doctrine does not apply to any acts of negligence that occurred after the Army authorized the decedent to return home pending final disposition of his medical status. They argue that the practical effect of this order was to remove the decedent from military control and to return him to civilian status; and thus, under the *Brooks* decision, *supra,* the Army's failure to provide reasonable care "up until his death" gave rise to an independent and compensable tortious act. Unfortunately, this argument ignores the regulatory scheme under which the decedent's future transfer to TDRL was processed. Army regulation AR–635–40, which implements 10 U.S.C. § 1201 *et seq.,*

expressly provides that the Commanding General of MILPERCEN has the sole authority to issue orders relieving Army personnel of their active duty status. As decedent's medical records demonstrate, those orders were not issued until August 8, 1980, five days after decedent's death. Indeed, decedent's request for a permanent duty station transfer expressly stated that "he remained subject to military control" until final orders arrived from MILPERCEN. Thus, whatever duty the Army owed the decedent after his return home was itself entwined with his military relationship. As such, any injuries which resulted from the Army's failure to provide such care can only be characterized as service-related. To hold otherwise, would require the court to second-guess the decisions made by the Army in handling the medical disabilities of its active service members. It would result in the same type of interference, with "the peculiar and special relationship of the soldier to his superiors," *United States v. Brown, supra,* 348 U.S. at 112, 75 S.Ct. at 143, as a medical malpractice action premised on the negligence of Army hospital personnel.

In conclusion, the court finds that plaintiffs are barred from recovery under the doctrine announced in *Feres v. United States, supra,* and accordingly, defendants are entitled to judgment dismissing the complaint.

SO ORDERED.

The Clerk of Court is directed to enter judgment for defendants dismissing the complaint. The Clerk is further directed to forward copies of this Memorandum and Order to counsel for the parties.